**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                              :
                                                    :        Chapter 11 (Subchapter V)
MAGNACOUSTICS, INC.,                                :
                                                    :        Case No. 21-70670(RG)
                                        Debtor.     :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### SUBCHAPTER V DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION


**MAYERSON & HARTHEIMER, PLLC**
845 Third Avenue, 11th floor
New York, NY 10022
(646) 778-4380
Sandra E. Mayerson, Esq.
David H. Hartheimer, Esq.

*Proposed Counsel for Debtor*
*and Debtor-in-possession*


Dated: May 31, 2022

## SUBCHAPTER V DEBTOR'S FIRST
## AMENDED PLAN OF REORGANIZATION

This Plan of Reorganization is presented to you to inform you of the proposed Plan for restructuring the debt and/or liquidating the assets of Magnacoustics, Inc., and to seek your vote to accept the Plan.

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan.

**[IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN,YOU MAY OBJECT TO CONFIRMATION OF THE PLAN. IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY _____, 2022, at __ _.m., Prevailing Eastern time.**

**YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE RETURNED BY _____,2022, at ---     -.m., Prevailing Eastern time. THE BALLOT MUST BE DELIVERED TO THE FOLLOWING ADDRESS:]**

> **Sandra E. Mayerson, Esq.**
> **136 E. 64th St.**
> **Suite 11-E**
> **New York, NY 10065**

**A self-addressed envelope is provided for this purpose, but you may also hand-deliver or use an overnight courier service for delivery of your Ballot, so long as it is received by the Voting Deadline. All Ballots must have original signatures and may not be emailed or transmitted electronically. [Any ballot which is not signed or is received after __ _.M., prevailing Eastern time, on _____, 2022, will not be counted as a vote on the Plan.]**

**[A TELEPHONIC HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR _____, 2022, at _____ _.M., Prevailing Eastern time.] Parties wishing to participate must make arrangements with the Bankruptcy Court in advance. Please consult the Bankruptcy Court's website for details.**

Your rights may be affected by this Plan. You should consider discussing this documentwith an attorney.

May 31, 2021

Mayerson & Hartheimer, PLLC
845 3rd Ave., 11th floor
New York, NY 10022
646-778-4381
Sandra E. Mayerson, Esq., and David H. Hartheimer, Esq.
sandy@mhlaw-ny.com
david@mhlaw-ny.com
Proposed Counsel for the Debtor and Debtor-in-Possession

## <u>TABLE OF CONTENTS</u>

**SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS… .........................1**

**ARTICLE 1: DEFINITIONS, RULES OF INTERPRETATION,**
**AND COMPUTATION OF TIME…........................................................................ 2**

    **A.**    **Scope of Definitions…............................................................... 2**

    **B.**    **Definitions…............................................................................. 2**

    **C.**    **Rules of Construction................................................................ 9**

    **D.**    **Computation of Time…............................................................ 10**

**ARTICLE 2: BACKGROUND OF THE DEBTORS…..................................... 10**

    **2.1. Filing of The Debtors' Chapter 11 Cases…........................... 10**

    **2.2. History and Nature of the Debtor's Business….................... 10**

    **2.3. Events Leading to the Filing of the Case………………………………11**

    **2.4 Legal Structure and Ownership..........................................13**

    **2.5. Debtor's Assets…............................................................... 13**

    **2.6. Debtor's Liabilities…......................................................... 13**

    **2.7. Significant Events During the Chapter 11 Case…................ 13**

    **2.8. Projected Recovery of Avoidable Transfers…..................... 15**

**ARTICLE 3: TREATMENT OF UNCLASSIFIED CLAIMS…........................... 15**

    **3.1. Administrative Expense Claims…....................................... 15**

    **3.2 Priority Tax Claims…......................................................... 16**

**ARTICLE 4: CLASSIFICATION OF CLAIMS AND INTERESTS…................................. 16**

**ARTICLE 5: TREATMENT OF CLASSES OF CLAIMS AND INTERESTS**
**UNDER THE PLAN…......................................................................... 17**

    **5.1. Class 1: Priority Non-Tax Claims…..................................... 17**

    **5.2. Class 2: General Unsecured Claims… ................................. 17**

**5.3. Class 3: Equity Interests…**..............................................................................**18**

**5.4. Remedies for Non-Payment to Class 2**……………………………………………**19**

**ARTICLE 6: ACCEPTANCE OR REJECTION OF THE PLAN**…...............................**19**

**6.1 Non-Voting Classes**……………………………………………………………**18**

**6.2. Voting Classes**…..............................................................................................**19**

**6.3. Acceptance by Impaired Classes of Claims and Interests**… ...............................**19**

**ARTICLE 7: MEANS OF IMPLEMENTATION OF THE PLAN**… .....................................**19**

**7.1. Conditions Precedent to the Effective Date**…...................................................**19**

**7.2. Vesting of Assets of the Estate**…....................................................................**20**

**7.3. Marketing of the Debtor's Assets**… ...............................................................**20**

**7.4. Plan Ombudsman**… .....................................................................................**20**

**7.5. Corporate Governance** ................................................................................**21**

**7.6. Key Employee Retention Plan**….....................................................................**22**

**7.7. Sources of Payments; Projections in Support of Debtor's Ability to Make Payments Under Proposed Plan**…...................................................................................**23**

**7.8  Preservation of Causes of Actions**… ...............................................................**24**

**7.9 Exemption from Certain Transfer Tax and Recording Fees**……………………**24**

**7.10 Discharge**…………………………………………………………………**24**

**7.11 Tax Consequences of the Plan**……………………………………………**25**

**ARTICLE 8: DISTRIBUTIONS**................................................................................**25**

**8.1. Payment Up to Allowed Claim**…....................................................................**25**

**8.2. Distributions**… ...........................................................................................**25**

**8.3. Distribution Agent**…....................................................................................**25**

**8.4. Disputed Claim Reserves**…...........................................................................**26**

**8.5. Estimation of Claims**….................................................................................**26**

**8.6. Objections**… ..............................................................................................**26**

**8.7. Updates to Claim Register Without Objection**…..................................................**26**

**8.8 Fractional Cents**…...............................................................................................**27**

**8.9. Setoffs**…............................................................................................................**27**

**8.10. Time Bar to Cash Payments by Check**…............................................................ **27**

**ARTICLE 9: EXECUTORY CONTRACTS UNDER THE PLAN**…....................................**27**

**9.1. Rejection of Executory Contracts**….................................................................... **27**

**9.2. Rejection Claims**…............................................................................................. **28**

**9.3. Assumption Prior to Entry of the Confirmation Order**… …………………….....**28**

**ARTICLE 10: RETENTION OF SUBJECT MATTER JURISDICTION**
**AND CAUSES OF ACTION**…...................................................................................... **28**

**10.1. Retention of Subject Matter Jurisdiction**........................................................... **28**

**10.2. Retention of Causes of Action**…........................................................................ **30**

**ARTICLE 11: MODIFICATION OF PLAN**…...............................................................**30**

**11.1 Prior to the Confirmation Order**…......................................................................**30**

**ARTICLE 12: PROVISIONS REGARDING INJUNCTIONS, EXCULPATION AND**
**RELEASES**…............................................................................................................ **31**

**12.1. Injunction Relating to the Plan**…......................................................................**31**

**12.2. Releases**…....................................................................................................... **31**

**12.3. Exculpation**…...................................................................................................**31**

**ARTICLE 13: FEASIBILITY OF THE PLAN**…...........................................................**32**

**13.1. Feasibility**….................................................................................................... **32**

**ARTICLE 14: LIQUIDATION VALUATION**…........................................................... **33**

**14.1. Liquidation Analysis**…..................................................................................... **33**

**ARTICLE 15: MISCELLANEOUS PROVISIONS…** ............................................................ 33

   **15.1. Governing Law…** ....................................................................................33

   **15.2. Notices…** ................................................................................................ 33

   **15.3. Reservation of Rights…** ........................................................................ 34

   **15.4. Final Decree…** ........................................................................................34

## SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

Magnacoustics, Inc., debtor and debtor-in-possession herein, has been exploring various ways to maximize value to creditors. In order to do so, the Debtor has reviewed its liquidation value, as well as the Disposable Income to be produced by an internal reorganization. Although the Debtor believes that it can successfully reorganize, it currently does not have a primary product, and this challenge will make reorganization expensive and difficult, and leave very little Disposable Income available to creditors. As a result, the Debtor is proposing a two-pronged approach to its reorganization. It will implement its business plans as discussed herein and begin to conduct business as a Reorganized Debtor. The Debtor estimates, as detailed herein, that by doing so, it will be able to provide payments to General Unsecured Creditors of $249,364 over the three and one-half years ending September 30, 2025, and pay priority and administrative claims. At the same time as it is implementing its business reorganization, the Debtor will engage the services of Sherwood Partners, Inc., as sales agent to try to sell all of the assets of the company as a going concern. If the company can be sold for an amount that will net at least 10% more than $249,364 to General Unsecured Creditors pursuant to an offer received prior to that date which is twelve (12) months from the Confirmation Date, the Debtor will sell the company and distribute the proceeds first to the cost of the sale and current payables (including, provision for taxes due upon the sale), second to the payment of administrative and priority claims, third to General Unsecured Creditors up to the Face Amount of their Claims, and any remaining amount to Equity Interests. Debtor will not sell the company unless it produces a higher return by at least 10% for General Unsecured Creditors than payments proposed herein. Thus, the plan sets a floor for payment to the General Unsecured Creditors over three and one-half years of what the Debtor estimates to be approximately 43.5 cents on the dollar, with the possibility of an upside should the company be sold. As detailed more fully herein, pursuant to this Plan, Mr. Salvatore LaMonica will be appointed as the Plan Ombudsman commencing on the Initial Distribution Date and continuing for 12 months (or longer if a sale is in prospect) to ensure that a robust and fair sale process is taking place.

**ALL HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR ARE ENCOURAGED TO READ THE PLAN OF REORGANIZATION IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

**THIS PLAN CONTAINS AN INJUNCTION INTENDED TO PROTECT THE DEBTOR FROM SUITS OR CLAIMS THAT MAY BE ASSERTED BY CREDITORS OR OTHER PARTIES-IN-INTEREST, AS WELL AS RELEASES AND EXCULPATION PROVISIONS INTENDED TO PROTECT THE DEBTOR AND ITS MANAGEMENT FROM SUITS OR CLAIMS THAT MAY BE ASSERTED BY CREDITORS AND OTHER PARTIES-IN-INTEREST. THESE MAY AFFECT YOUR RIGHTS. YOU ARE ENCOURAGED TO READ ARTICLE 12 FOR MORE INFORMATION ABOUT SUCH MATTERS.**

# ARTICLE 1
## DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

**A.      Scope of Definitions**

    For purposes of this Plan, unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article 1.B. of this Plan. Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

**B.      Definitions**

    **1.1. "Administrative Expense Bar Date"** shall apply to Administrative Expense Claims and means the first Business Day that is sixty (60) days after the Effective Date or such other date as established by Final Order of the Bankruptcy Court.

    **1.2. "Administrative Expense Claim"** or **"Administrative Claim"** means any right to payment constituting a cost or expense of administration of the Chapter 11 Case under Sections 503(b) and 507(a)(2) of the Bankruptcy Code, including without limitation: (a) any actual and necessary costs and expenses incurred on or after the Commencement Date of preserving the Estate and operating the Debtor's business; (b) Claims that have been determined by a Final Order to constitute an administrative expense of the Estate; (c) Professional Fee Claims; and (d) any fees or charges assessed against and payable by the Debtors under Section 1930 of title 28 of the United States Code.

    **1.3. "Allowed"** means with respect to Claims (a) any Claim against a Debtor, proof of which is timely Filed or by order of the Bankruptcy Court is not or will not be required to be Filed, (b) any Claim that has been or is hereafter listed in the Schedules as neither disputed, contingent or unliquidated, and for which no timely Filed proof of Claim has been Filed, or (c) any Claim allowed pursuant to this Plan and, in each such case in (a) and (b) above, as to which either (i) no objection to the allowance thereof has been Filed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (ii) such an objection is so Filed and the Claim shall have been allowed pursuant to a Final Order (but only to the extent so allowed).

    **1.4. "Assets"** means all assets and property of the Estate of the Debtor, regardless of whether reflected in the financial records of the Debtor, including but not limited to: Cash, deposits, refunds, rebates, abatements, fixtures, equipment, inventory, contractual interests, intangibles, claims, Causes of Action, suits, setoffs, recoupments, equitable or legal rights, interests and remedies.

    **1.5. "Avoidance Actions"** means the Causes of Action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code. These may also be referred to as the "Chapter 5 Causes of Action".

**1.6. "Ballots"** means the ballots accompanying the Plan upon which Holders of Impaired Claims and Interests entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

**1.7. "Bankruptcy Code"** means title 11 of the United States Code, as amended and in effect on the Commencement Date.

**1.8. "Bankruptcy Court"** means the United States Bankruptcy Court for the Eastern District of New York having jurisdiction over the Chapter 11 Case or such other court of competent jurisdiction as may have such jurisdiction in the future.

**1.9. "Bankruptcy Rules"** means (a) the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code, and (b) the Local Rules of the Bankruptcy Court, in each case, as in effect on the Commencement Date.

**1.10 "Bar Date"** means the deadline set by the Bankruptcy Court pursuant to the Bar Date Order or other Final Order for filing Proofs of Claim in the Case, as the context may require.

**1.10 "Bar Date Order"** means the order entered by the Bankruptcy Court on August 18, 2021, [Docket No. 63] and any subsequent order supplementing such order or relating thereto.

**1.10. "Business Day"** means any day other than: (a) a Saturday, (b) a Sunday, and (c) a "legal holiday" as defined in Bankruptcy Rule 9006(a).

**1.11. "Case"** has the same meaning as the term "Chapter 11 Case".

**1.12. "Cash"** means legal tender of the United States of America.

**1.13. "Cash Equivalents"** means equivalents of Cash in the form of readily marketable securities or instruments issued by an Entity, including readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's rating of "P2" or better, or equivalent rating of any other nationally recognized rating service, or interest bearing certificates of deposit or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or capital of not less than five hundred million dollars ($500,000,000) having maturities of not more than one year, at the then generally prevailing rates of interest for like amounts and like periods.

**1.14. "Causes of Action"** means any and all actions, causes of action, rights, suits, debts, sums of money, damages, judgments, claims, and demands whatsoever, whether known or unknown, existing or hereafter arising, in law, equity, or otherwise, including but not limited to the Avoidance Actions, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Case, including through the Effective Date, that belong to the Debtor or its Estate.

**1.15.** **"Chapter 11 Case"** means this chapter 11, Subchapter V, case of Magnacoustics, Inc., pending in the United States Bankruptcy Court for the Eastern District of New York as Case No. 21-70670 (REG).

**1.16.** **"Claim"** means any claim against the Debtor, regardless of whether asserted and regardless of whether known, as the term "claim" is defined in Section 101(5) of theBankruptcy Code.

**1.17.** **"Claims Objection Deadline"** shall have the meaning ascribed to it in Section 8.7. of the Plan.

**1.18.** **"Class"** means any group of substantially similar Claims or Equity Interests classified by the Plan pursuant to Section 1122 of the Bankruptcy Code.

**1.19.** **"Commencement Date"** means April 9, 2021, the date on which the Debtor filed its voluntary petition under chapter 11, Subchapter V, of the Bankruptcy Code.

**1.20.** **"Confirmation Date"** means the date on which the Confirmation Order becomes a Final Order.

**1.21.** **"Confirmation Hearing"** means the hearing held by the Court to consider the confirmation of the Plan, as it may be adjourned or continued from time to time.

**1.22.** **"Confirmation Order"** means an order of the Court confirming the Plan under Section 1129 of the Bankruptcy Code that has become a Final Order.

**1.23.** **"Creditor"** has the meaning ascribed to such term in § 101(10) of the Bankruptcy Code.

**1.24.** **"Cure"** means the payment or other honoring of all obligations required to be paid or honored in connection with the assumption of an Executory Contract or Unexpired Lease pursuant to § 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if it all, pursuant to § 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution, within a reasonable period of time following the Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of and Executory Contract or Unexpired Lease, pursuant to §365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such other amount as may be agreed upon by the parties, under such Executory Contract or Unexpired Lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.27.** **"Cure Notice"** means the notice of proposed Cure amount provided to counterparties to assumed Executory Contracts or Unexpired Leases pursuant to Article 9 of the Plan.

**1.28** **"Cure Objection Deadline"** means the deadline for filing objections to a Cure Notice or proposed Cure, which shall be on or before fourteen (14) days after the applicable counterparty was served with a Cure Notice.

1.29. **"Debtor"** means Magnacoustics, Inc., as a debtor and debtor-in-possession in this Case.

1.30. "**Disallowed**" means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, or as provided in this Plan; (b) a Claim or any portion thereof that is Scheduled at zero or as an unknown amount, or as contingent, disputed, and/or unliquidated, and as to which a Proof of Claim Bar Date has been established but proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law; or (c) Claim or any portion thereof that is not Scheduled and as to which a Proof of Claim Bar Date has been established but proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

1.31. "**Disposable Income**" shall have the meaning ascribed to it in § 1191(d) of the Bankruptcy Code.

1.32. **"Disputed Claim"** means a Claim or any portion thereof that is not an Allowed Claim.

1.33. **"Disputed Reserve" or "Disputed Claim Reserve"** means the aggregate amount of Cash that would have been distributed on the Distribution Dates to the Holders of Disputed Claims if such Disputed Claims had in fact been Allowed on such date (a) for liquidated Claims, in the amount asserted in a filed Proof of Claim or Administrative Claim; and (b) for unliquidated Claims, the amount asserted in a filed Proof of Claim or Administrative Claim, or, if an estimation proceeding has taken place, the amount estimated by the Court .

1.34. **"Distribution"** means a distribution of Cash or other Assets of the Estate made in accordance with the Plan.

1.35. "**Distribution Date**" means the date on which the Debtor shall make a Distribution, which shall be a date or dates selected by the Debtor in accordance with the terms of this Plan. The first such Distribution Date shall be referred to as the "**Initial Distribution Date**" and shall occur no later than ten (10) business days after the Effective Date.

1.36. "**Effective Date**" means a Business Day selected by the Debtor after which all conditions to the occurrence of the Effective Date set forth in Section 7.1. have been satisfied or duly waived which is no later than fifteen (15) days after such conditions have been satisfied.

1.37. "**Entity**" means an entity as defined in Section 101(15) of the Bankruptcy Code.

1.38. "**Equity Interest, or Interest**" means the legal, equitable, contractual, and other rights of any Person with respect to existing shares or other equity interest, or any other equity securities of, or ownership interests in, the Debtor.

1.39. "**Estate**" means the Debtor's chapter 11 estate created by the commencement of and in the Chapter 11 Case pursuant to Section 541 of the Bankruptcy Code.

1.40. "**Estate Litigation**" means all proceedings arising from or relating to: (i) all Claims, (ii) objections to Claims, (iii) Causes of Action, including but not limited to, any litigation or claims that can be instituted or asserted by the Estate, the Debtor, the Reorganized Debtor or by any party on behalf of or for the benefit of the Estate.

**1.41.** **"Exculpated Claim"** means any claim (as defined in §101 (5) of the Bankruptcy Code) or Causes of Action whatsoever related to any act taken or omitted after the Commencement Date arising out of the Chapter 11 Case related to the Debtor, including, without limitation, (i) the negotiation of any settlements entered into, with, or by the Debtor or any Estate representative, (ii) the formulation, preparation, dissemination, negotiation, filing, prosecution, approval or administration of the Plan and/or any financing, investment, or sale agreement with respect to the Debtor, and/or (iii) any contract, instrument, release, assignment, or other agreement or document created or entered into in connection with any such negotiations or settlements of the Chapter 11 Case, or any financing agreement or settlement agreement in connection therewith, the filing of the Chapter 11 Case, the pursuit of Confirmation, and the administration implementation of the Plan.

**1.42.** **[Intentionally Omitted]**

**1.43.** **"Executory Contract"** means a contract or unexpired lease (including amendments thereto) to which a Debtor is a party that is or previously was subject toassumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**1.44.** **"Face Amount"** means (a) when used in reference to a Disputed Claim or Disallowed Claim, the full stated liquidated amount claimed by the Holder of a Claim in any Proof of Claim, or amendment thereof, in accordance with any applicable law, timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, the amount estimated for such Claim in an order of the Bankruptcy Court, and (b) when used in reference to and Allowed Claim or Allowed Interest, the Allowed amount of such Claim or Interest. If none of the foregoing applies, the Face Amount of the Claim shall be zero ($0) dollars.

**1.45.** **"File"** or **"Filed"** means, with respect to any pleading, entered on the docket of the Chapter 11 Case and properly served in accordance with the Bankruptcy Rules.

**1.46.** **"Final Order"** means an order or judgment of the Court as to which the time to appeal, petition for certiorari, seek mandamus, or move for reargument, reconsideration, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument, reconsideration, or rehearing is pending; or, if an appeal, writ of certiorari, or petition for mandamus, reargument, reconsideration, or rehearing has been Filed or sought with respect to any order or judgments of the Court, that order or judgment has been affirmed by the highest courtto which it was appealed, or certiorari has been denied or mandamus, reargument, reconsideration, or rehearing has been denied or resulted in no modification thereof,and the time to take any further appeal, petition for certiorari, or move for mandamus, reargument, reconsideration, or rehearing shall have expired; provided, however, thatthe possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure (or any analogous motion under the Bankruptcy Rules) may be Filed with respect toan order or judgment shall not cause such order or judgment not to be a Final Order.

**1.47.** **"General Claims Bar Date"** means October 4, 2021.

**1.48.** **"Governmental Claims Bar Date"** means October 7, 2021.

**1.49.** **"General Unsecured Claim"** means any Claim against a Debtor that is not (i) a Secured Claim; (ii) entitled to priority under Sections 503 or 507 of the BankruptcyCode; or (iii) an

Administrative Expense Claim, Priority Tax Claim, or a Priority Non-Tax Claim.

      **1.50.** "**General Unsecured Creditor**" means the Holder of a General Unsecured Claim.

      **1.51. "Holder"** means the beneficial holder of any Claim or Equity Interest, in its capacity as such.

      **1.52.  "ICS**" means Integrated Computer Solutions, Inc.

      **1.53. "Impaired"** shall have the meaning ascribed to it in Section 1124 of the Bankruptcy Code.

      **1.54. "Insiders"** shall have the meaning ascribed to it in Section 101(31) of the Bankruptcy Code, plus all entities under common control with the Debtor as of the Petition Date.

      **1.55.**  "**Key Employee Retention Plan**" or "**KERP**" means that certain incentive plan to retain employees through the sale process as described herein at Section 7.6.

      **1.56. "Liabilities"** means the liabilities of the Estate, whether or not reflected in the financial records of the Debtor.

      **1.57. "Lien"** shall have the meaning ascribed to it in § 101(37) of the Bankruptcy Code, except that a lien that has been or may be avoided or void shall not constitute a Lien for the purposes of the Plan.

      **1.58. "Magnacoustics"** means Magnacoustics, Inc., the debtor and debtor-in-possession in this Chapter 11 Case.

      **1.59. "Person"** means a person as defined in § 101(41) of the Bankruptcy Code.

      **1.60. "Petition Date"** means April 9, 2021, the date this Chapter 11 Case was commenced. "Petition Date" is used interchangeably with "Commencement Date", and means the same thing.

      **1.61. "Plan"** means this plan of reorganization for the resolution of outstanding Claims and Interests in the Case, as may be modified, amended, or supplemented at any time in accordance with the Bankruptcy Code, Bankruptcy Rules, and the terms hereof, including all exhibits, supplements, appendices, and schedules hereto.

      **1.62.** "**Plan Ombudsman**" means the person appointed post Initial Distribution Date to monitor the sale process and carry out the duties set forth in Article VII. The Debtor is requesting that the Court appoint Salvatore LaMonica as the Plan Ombudsman.

      **1.63. "Plan Proponent"** means the Debtor.

      **1.64. "Plan Supplement"** means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed at least ten (10) calendar-days before the Confirmation Hearing, and any additional documents or schedules Filed before the Effective Date as supplements or amendments to the Plan Supplement. The Debtor shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

1.65. **"Prepetition Obligations"** means all of Debtor's obligations, indebtedness, and liabilities arising prior to or existing as of the Petition Date.

1.66. **"Priority Non-Tax Claim"** means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

1.67. **"Priority Tax Claim"** means any Claim of a governmental unit (as that term is defined in the Bankruptcy Code) of the kind entitled to priority in payment as specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.68. **"Professional"** means any person or Entity employed by the Debtor in accordance with Sections 327, 328, or 1103 of the Bankruptcy Code, and who shall be compensated for services rendered prior to the Effective Date pursuant to Sections327, 328, 329, 330, or 331 of the Bankruptcy Code.

1.69. **"Professional Fee Bar Date"** shall apply to Professional Fee Claims and means the first Business Day that is sixty (60) days after the Effective Date or such other date established by Final Order of the Bankruptcy Court.

1.70. **"Professional Fee Claims"** means an Administrative Claim for reasonable compensation of a Professional for services rendered or expenses incurred in the Chapter 11 Case on or prior to the Effective Date.

1.71. **"Pro Rata"** means, with reference to any Distribution on account of any AllowedClaim in any Class, the ratio (expressed as a percentage) that the amount of the Allowed Claim bears to the aggregate amount of all Allowed Claims in that Class. Until all Disputed Claims are Resolved, Disputed Claims shall be treated as AllowedClaims in the amount used for calculation of the Disputed Reserve for the purpose of calculating Pro Rata Distributions of the Assets.

1.72. **"Proof of Claim"** means a Claim Filed against the Debtor in the Chapter 11 Case.

1.73. **"Record Date for Voting"** means the record date for determining the entitlementto vote then Allowed Claims and Interests, which date is [_____, 2021].

1.74. **"Rejected Contract"** means an Executory Contract deemed rejected effective as of the Effective Date or such other date as may be agreed to by the parties to the Executory Contract or as ordered by the Bankruptcy Court.

1.75. **"Rejection Claim"** means any Claim arising from a Rejected Contract, includingany Claim of (a) a lessor for damages resulting from the rejection of a lease of real property as any such Claim shall be calculated in accordance with Section 502(b)(6)of the Bankruptcy Code, or (b) an employee for damages resulting from the rejectionof an employment agreement as any such Claim shall be calculated in accordance with § 502(b)(7). A Rejection Claim shall constitute a General Unsecured Claim.

1.76. **"Rejection Claims Bar Date"** means the deadline to File a Proof of Claim for damages under a Rejected Contract and such deadline is thirty (30) days after the entry of an order by the Bankruptcy Court rejecting such contract or thirty (30) daysafter entry of the Confirmation Order (in the event the Rejected Contract was rejectedpursuant to the Plan), whichever occurs first.

**1.77. "Representatives"** means, without limitation, any existing or former affiliate, subsidiary, member, officer, director, partner, stockholder, trustee, member, representative, employee, agent, attorney, business advisor, financial advisor, accountant, other Professional, their successors or assigns, or any Person who is or was in control of any of the foregoing.

**1.78.** "**Reorganized Debtor**" means the Debtor Entity, or any successor thereto, from and after the Effective Date, in which all the Assets of the debtor-in-position vest. Where the context requires, the term "Debtor" will mean the Reorganized Debtor.

**1.79. "Schedules"** means the schedules of assets and liabilities and the statement of financial affairs Filed by the Debtor pursuant to § 521 of the Bankruptcy Code, as such schedules and statement have been or may be supplemented or amended from time to time.

**1.80.** "**Secured Claim**" means an Allowed Claim that is secured by a Lien (which is valid, perfected, and enforceable under applicable law or by reason of a Final Order) on the property in which the Estate has an interest or that is subject to a set off under § 553 of the Bankruptcy Code, to the extent of the value of the collateral, as determined in accordance with § 506(a) of the Bankruptcy Code, or to the extent of the amount subject to setoff. The Debtor is unaware of any Secured Claims in the Case.

**1.81.** "**Subchapter V Trustee**" means Salvatore LaMonica who has been appointed by the U. S. Trustee to be the Subchapter V Trustee in this Case. The Subchapter V Trustee is deemed a Professional for all purposes having to do with compensation pursuant to this Plan. The role of the Subchapter V Trustee shall terminate upon substantial consummation of the Plan.

**1.82. "Unclaimed Property"** means any Distributions that are returned to the Debtor as: (i) undeliverable to a Creditor or Interests Holder, or (ii) unclaimed by a Creditor or Interest Holder, as further described in Section 8.2.

**1.83. "Unimpaired"** means an Allowed Claim or Equity Interest that is not "Impaired"within the meaning of Section 1124 of the Bankruptcy Code.

**1.84. "United States Trustee" or "U.S. Trustee"** means the United States Trustee appointed under Section 591 of title 28 of the United States Code to serve in the Eastern District of New York.

## C.    Rules of Construction

Wherever from the context it appears appropriate, each term stated in either the singular orthe plural shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter. For purposes of the Plan: (a) any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the documentshall be substantially in that form or substantially on those terms and conditions; (b) any referencein the Plan to an existing document or exhibit Filed or to be Filed means the document or exhibit as it may have been or may be amended, modified, or supplemented; and (c) unless otherwise specified, all references in the Plan to Articles, Schedules, and Exhibits are references to articles, schedules, and exhibits of or to the Plan. Unless otherwise specified, the words "herein," "hereof,""hereto," "hereunder," and other words of similar

meaning refer to the Plan as a whole and not to any particular article, section, subsection, or clause contained in the Plan. A capitalized term usedbut not defined herein shall have the meaning given to that term in the Bankruptcy Code. The rulesof construction contained in Section 102 of the Bankruptcy Code shall apply to the construction of the Plan.

The headings in the Plan are for convenience of reference only and shall not expand, limit,or otherwise affect the provisions of the Plan. Unless otherwise indicated herein, all references todollars are to United States dollars.

**D.      Computation of Time.**

Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply. If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.


# ARTICLE 2
# BACKGROUND OF THE DEBTOR

### 2.1.    Filing of The Debtor's Chapter 11 Case.

On April 9, 2021, the Debtor filed a voluntary petition for relief pursuant to chapter 11, subchapter V, of the Bankruptcy Code. The case is pending in the United States Bankruptcy Court for the Eastern District of New York as Case No. 21-70670 (REG).

### 2.2.    History and Nature of the Debtor's Business.

The Debtor was incorporated as a New York corporation in 1989 by Wayne Lederer, an inventor, entrepreneur, and visionary. Wayne passed away unexpectedly in 2019. He was the husband of Lisa Lederer, the current CEO and sole shareholder.

Wayne invented a sound system for use in magnetic resonance imaging ("MRI") devices, solving the problem of audio delivery within a highly magnetic field by patenting the world's first magnetically inert music system. He owned several patents in this area, which have since become the property of his wife, Lisa. A list of the patents is an exhibit to the license agreement between the Debtor and Lisa Lederer, which is attached hereto as **Exhibit 4**. Wayne founded the Debtor to exploit those patents by producing audio systems, earpieces, and communications devices which can be used by patients and technicians during MRI scans. The Debtor's products allow users to listen to their choice of music, receive instructions, control the scanning procedure, control volume, and indicate problems while scans are in process, as well as providing automated breathing instructions. As a result, MRI scans can be completed with minimal disruption, and the patient is much more at ease by listening to music. In addition to the primary music system, the Debtor sells a variety of peripherals, including disposable earbuds and headsets. It also has a safety feature called the Magna Alarm which allows a patient to signal distress. The Debtor's products are certified domestically by Underwriters Laboratories, and internationally by TUV.

The Debtor quickly became the leader in its field and enjoyed many successful years. General

Electric, one of the leaders in manufacturing MRI machines, used the Debtor's products exclusively for many years, giving Debtor sole access to its Auto Voice Port. Because of the relationship with General Electric and the collaboration with its engineers in developing MRI Auto Voice technology, the Debtor was granted a verbal agreement to maintain exclusive access to the Auto Voice Port, giving the Debtor a significant advantage in the marketplace. The Debtor's primary product, the Genesis Ultra System, allows direct control by the patient of the audio channels while inside the MRI scanner, including volume adjustment, and permits the patient and technician to communicate throughout the scan. In addition, Magnacoustics's proprietary earbuds and Magnacoil have the highest attenuation ratings of hearing protection of all of its competitors.

### 2.3.    Events Leading to the Filing of the Case[1].

After many years as the market leader, Wayne decided in 2013 that the Debtor needed to update its product to meet market demand and continue to be the market leader. Among the many innovations he envisioned were allowing the audio system to make use of the many different music services which had come on the market since the initial founding of the company in 1989, and to have the audio translate for the patient if the patient did not speak English. The proposed innovations were well received by customers, and Wayne set about inventing same, to be incorporated into a new primary music system called the MagnaTouch. He promised General Electric that they would have the new MagnaTouch product by July 1, 2016. Since Wayne was an inventor and visionary, and not a computer programmer, he worked with an outside consulting firm. Together, they developed a prototype in 2015 which delivered all the bells and whistles which the customers had requested; however, it was developed on a Windows platform. The Debtor was advised by General Electric that the product would not be marketable unless it was on a Linux platform.

Accordingly, the Debtor hired Integrated Computer Solutions, Inc. ("ICS"), to port the Windows software into a Linux platform, but the results were unsatisfactory in the opinion of the Debtor. The job took considerably longer than expected, and was never accomplished to the Debtor's satisfaction. Furthermore, although it is the Debtor's view that the project had originally been contracted to cost $7500, for various reasons, the Debtor paid ICS $444,187.98 over 17 months. This cut greatly into the Debtor's cash reserves. At the end of 17 months, Debtor still did not have a primary product it felt it could sell, and ICS and the Debtor parted ways. Unfortunately, by announcing the MagnaTouch with all its bells and whistles, the Debtor in effect made its own product, the Genesis Ultra System, obsolete. All its customers were waiting for the new MagnaTouch. This, together with the significant cash expended on the project, were major factors contributing to the bankruptcy.

Throughout this time, General Electric and other customers were waiting excitedly to see the new MagnaTouch product. General Electric had given the Debtor an initial deadline of July 1, 2016, for the rollout of the new product. When the Debtor could not deliver the Magnatouch on time, General Electric reluctantly rescheduled the deadline to November 29, 2016, but there was a price. General Electric insisted that on any of the old Genesis Ultra products it ordered in the meantime, it had to get a deep discount because of the foreseeable obsolescence when MagnaTouch was introduced to the market. As a result, while the Debtor still had a decent volume of business, it could no longer make a reasonable profit on its primary product. This, coupled with the huge amounts of money that were going out to develop MagnaTouch, started the Debtor's slide into financial distress and fraying customer relations.

---

[1] This is written from the Debtor's point of view. Although the Debtor believes in good faith that this is accurate, ICS may well contest the views set forth herein.

The MagnaTouch, operating on Linux, failed in front of all of Debtor's customers, including GE, and all of its competitors at a tradeshow in November 2016. As a result, customer relationships built up over 25 years were rent asunder, creating opportunity for competitors. General Electric terminated its exclusive relationship for its Auto Voice Port with the Debtor, and now buys audio systems for its MRI machines from numerous competitors. The competitors, seeing what the MagnaTouch was supposed to do and did not, improved their own products, to the point that Genesis Ultra became increasingly out of date and obsolete. On the Petition Date, the Debtor not only did not have a primary product with which it could compete with what is standard in the market today, but also, preparing a primary product for market would take a significant investment in research and development, since, Wayne is no longer there to envision and invent the product. As a result, the Debtor has been struggling for survival ever since the November 2016 tradeshow, but has been able to effectively use the Chapter 11 Case to develop a new primary product as discussed below.

Having been crippled by the failure in the development of MagnaTouch, having no primary product, the devastating tradeshow demonstration, and the huge amounts of money spent on ICS with no satisfactory result, and having made its own Genesis product somewhat obsolete by announcing MagnaTouch, the Debtor felt it had no choice but to sue ICS for the money it had paid and for damages as a result of ICS's conduct. On August 11, 2017, the Debtor sued ICS in the Southern District of New York for multimillion dollar damages, which case was subsequently transferred to the Eastern District of New York. ICS retaliated by filing suit against the Debtor in Massachusetts, alleging that the Debtor still owed it $489,920.21 on unpaid invoices. Their suit was eventually consolidated with the case in New York.

While the Debtor expected the lawsuit to save the company, in fact, it had quite the opposite effect. The lawsuit had been dragging on since 2017, and on the Commencement Date, discovery had not even been completed. Nonetheless, there was extensive and expensive motion practice. At a time when the Debtor needed to focus its resources on developing a primary product which would compete with new products in the marketplace—products which had already taken advantage of Wayne's vision-- all of its resources were being drained to support the litigation. Without a primary product that would be competitive, the Debtor-- once the leader in the industry-- was losing money every month and fighting for survival. Yet Wayne still felt he could turn things around.

Just when the Debtor had reached its nadir and was in the thick of litigation and a fight for survival, Wayne unexpectedly passed away on July 13, 2019. This created true turmoil, because, Wayne had always run the Debtor single-handedly, and he was the engineer, inventor, and visionary behind all of the Debtor's products. 100% of the ownership of the Debtor, as well as ownership of the patents, fell to Wayne's widow, Lisa Lederer. Although Lisa had been by Wayne's side as he built the business, she had no previous experience running a business and turned to others for help. Unfortunately, some bad hiring decisions were made, which caused the company to sink even lower. Eventually, Lisa had no choice but to take over as CEO herself and to hire a highly competent COO, Marty Lydon. They put together a highly competent management team, but between the missteps during the void created by Wayne's sudden demise, the huge amounts of money going out for litigation expenses, and the lack of a primary product at the time, the Debtor simply could not survive without the breathing space of a chapter 11, and the concomitant opportunity to use the bankruptcy proceeding to settle the ICS litigation, which, as discussed in more detail below, it has done during the Case. Accordingly, on April 9, 2021, the Debtor filed for protection pursuant to Chapter 11, subchapter V, of the Bankruptcy Code.

### 2.4.    Legal Structure and Ownership.

The Debtor is a New York corporation which is wholly-owned by Lisa Lederer. The Debtor has 200 shares of authorized stock, no par value, of which only 100 shares have been issued. These are all owned by Lisa Lederer.

### 2.5.    Debtor's Assets.

As the Liquidation Analysis attached hereto as **Exhibit 1** demonstrates, at the Petition Date, the Debtor had tangible Assets of approximately $651,000. Much of this consisted of accounts receivable, which the Debtor has collected during the Case. It continues to push to collect all pre-Petition accounts receivable. Subsequent to the Petition Date, as the Debtor sells products, new accounts receivable are continuously being created and cash continues to be collected from the post-Petition accounts receivable.

In addition to its tangible assets, the Debtor has a lease for the premises which it occupies in Atlantic Beach, New York, which runs through 2025. The Debtor does not own the patents on which its products are based, but Lisa Lederer, who inherited the patents from her husband Wayne, has entered into a perpetual, royalty-free license with the Debtor with respect to all of the pertinent patents. A copy of the license agreement is attached hereto as Exhibit 4. Although, such license terminates upon a change of control, its terms require Lisa to enter into a perpetual license with any buyer of the company for a 5% royalty. Any buyer is free to negotiate more favorable terms, but Lisa cannot refuse to license the patents to a buyer on these extremely favorable terms for the buyer. In addition, the Debtor owns all of its trademarks. At the outset of the Case, the trademarks were mistakenly registered in the name of Lisa Lederer, as they had been transferred to her when the patents owned by Wayne's estate were transferred to her. Upon IP counsel pointing out that Wayne, and hence his estate, had never owned the trademarks, Lisa transferred them back into the Debtor's name for no remuneration, and they are currently registered in the Debtor's name and are an asset of the Debtor.

### 2.6.    Debtor's Liabilities.

There are no known Secured Claims against the Debtor.

The Debtor did not Schedule any Priority Claims, but $22,371.48 in Priority Claims were filed against the Debtor by the Bar Date. Of these, $1126.08 is a reclamation claim which the Debtor believes is valid, and the remainder are claims of taxing authorities which the Debtor plans to dispute and reserves the right to object to.

Currently, there are approximately $571,803 of General Unsecured Claims either Scheduled or Filed against the Debtor. The Debtor hopes to reduce this number through the Claims Objection process, and reserves the right to object to any Claims.

In addition to the above Claims, the Debtor believes that after the application of retainers, there will be approximately $416,000 of Professional Fees Claims through the Effective Date, inclusive of the fees of the Subchapter V Trustee.

### 2.7.    Significant Events During the Chapter 11 Case.

During the Chapter 11 Case, the Debtor requested that Mayerson & Hartheimer, PLLC, be approved by the Court as counsel to the Debtors, and CLA be approved by the Court as accountant and financial advisor to the Debtor. No objections were filed, and such retentions were approved. In addition,

the Debtor has sought an order permitting the employment of ordinary course professionals and expects to use employment counsel and IP counsel through these means.

By far the most significant event in the Case has been the approval of a settlement agreement with ICS. Pursuant to the settlement, ICS has an Allowed General Unsecured Claim in the amount of $409,500; provided, that a Plan is confirmed. ICS retains the right to object to a proposed Plan, but if a plan is confirmed, even over the objections of ICS, then the settlement holds. The settlement agreement also requires the Debtor to keep counsel to ICS abreast of the Debtor's financial condition and plan prospects. As a result, the Debtor's counsel has communicated with counsel to ICS periodically as it has moved toward a Plan.

The Debtor has also re-shaped its management team and staff during the Case, recruiting for the following positions: Administrative and Operations Officer, Product and Sales Officer, Quality and Regulatory officer, Office Assistant, and various other positions. The Debtor believes it now has a strong core team in the New York office with excellent teamwork and communication internally.

The Debtor has also taken significant strides to reorganize its business. The most important of these has been the development of a relationship with an overseas manufacturer of similar products. Working with such manufacturer, the Debtor has developed a new primary product called the Phoenix which it introduced at a tradeshow in November 2021 with great success. The Debtor already has future orders for the Phoenix, and it is expected that this product will fill the void left by the Debtor's inability to bring the Magna Touch to market. This relationship obviates the need for the Debtor to develop its own product and thereby cuts down significantly on R&D costs and outside consultants, a fact which has allowed the Debtor to commit to higher payments to General Unsecured Creditors then it originally thought possible. The manufacturer has also agreed to split the cost of regulatory approvals, which greatly decreases the cost of bringing the Phoenix to market. Debtor hopes to become the exclusive distributor of the manufacturer's products in the United States, and is also working toward having the manufacturer distribute the Debtor's peripheral products overseas.

Among other initiatives, the Debtor has worked hard to repair its relationship with General Electric; designed a new website which has been launched with great success and which allows clients to order product directly online, which until now they could not do; started opening up European markets; hired a new Quality Engineer & Regulatory Officer with responsibility for developing and managing new quality control systems, addressing the constantly changing regulatory requirements of the Eurasian markets, developing new processes to improve customer satisfaction, as well as maintaining regulatory compliance; have begun to re-engineer the MagnaCoil product so that it can be assembled in half the time from previous production, which will result in a decrease in production time, lower material costs, and lower labor costs, which will in turn increase profit margins; and have begun an initiative to open up European markets. Most importantly, as discussed above, the Debtor has entered into negotiations with an overseas manufacturer of similar products to become its exclusive distributor of products in the United States, and is working with such company to develop a product for the US markets which would be sold under the Magnacoustics name. If this initiative is successful, it would obviate the need for the Debtor to develop its own new primary product and thereby cut down significantly on R&D costs and outside consultants. In addition, if this initiative is successful, the counterparty has agreed to split the costs of regulatory approvals, which greatly decreases the cost of bringing a new product to market.

The Debtor has also used the breathing space of the Chapter 11 Case to correctly register the patents and trademarks. As set forth above, all of the Debtor's trademarks had been mistakenly transferred

to Lisa Lederer upon Wayne Lederer's death. All of such trademarks have now been registered in the name of the Debtor at no cost to the Debtor. Also, shortly before Wayne's death, three patents owned by him were mistakenly registered in Europe in the name of the Debtor, even though, the Debtor did not own the patents. This has also been corrected, or is in the process of being corrected, at no cost to the Debtor. As the patents will now be correctly registered in the name of Lisa Lederer, they will be included in the license she is obliged to give to any buyer.

### 2.8. Projected Recovery of Avoidable Transfers.

The Debtor is aware of one potentially significant fraudulent conveyance against its former CEO, Matthew Young, who converted Debtor assets to his personal use. The Debtor has hired a private investigator to determine the whereabouts of Mr. Young, as well as to determine whether or not he is judgment proof. The Debtor is still in the midst of its cost-benefit analysis to determine whether it makes sense to bring suit against Mr. Young. The potential Causes of Action against Mr. Young will vest in the Reorganized Debtor.

The Debtor is unaware of any other significant avoidable transfers. As a consequence, the Debtor does not currently intend to pursue any other preference, fraudulent conveyance, or other avoidance actions. The right to do so, however, is reserved to the Reorganized Debtor.

### ARTICLE 3
### TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Equity Interests set forth in Article 4 hereof. These unclassified Claims are treated as follows:

### 3.1. Administrative Expense Claims.

(a) **Administrative Expenses**. Each Holder of an Allowed Administrative Expense Claim other than Professional Fee Claims will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash: (i) in the ordinary course of business if such Claim is not past due; (ii) on the Initial Distribution Date of the Plan if such Allowed Claim is already due by such date, or (iii) if such Claim is Allowed after the Initial Distribution Date, on the date such Claim is Allowed or as soon as practicable thereafter.

The Debtor has been paying its bills timely and does not believe that there are any significant Administrative Expense Claims against the Debtor other than Professional Fee Claims referred to below.

(b) **Professional Fee Claims**. Each Professional who holds a Professional Fee Claim shall be required to File with the Bankruptcy Court, and to serve on all parties required to receivenotice, a final Fee Application on or before the Professional Fee Bar Date. The failure to timely File the Fee Application shall result in the Professional Fee Claim being forever barred and discharged. A Professional Fee Claim with respect to which a fee application has been properly and timely filed pursuant to this Article 3 shall be paid only to the extent Allowed by Final Order. No Professional Fee Claims shall be Allowed on account of any services rendered by a Professional whose retention with respect to the Chapter 11 Case has not been approved by the Bankruptcy Court. Once the Professional Fee Claims are approved, the Debtor

may stretch the payments over the two fiscal years following the Effective Date. At present, the Debtor is estimating that it will pay 32% of the Professional Fees, on a pro rata basis, upon approval; 40% in January 2023; 15% in September 2023; and 13% in February 2024. The Debtor reserves the right to pay the Professional Fees more quickly if funds are available. All outstanding Professional Fees will be paid upon a sale of the company.

The Debtor estimates that there will be approximately $416,000 in Professional Fee Claimsby the Effective Date, exclusive of applied retainers.

(c) **Administrative Expense Bar Date**. Requests for payment of Administrative Expense Claims other than Professional Fees must be filed by the Administrative Expense Bar Date. Holders of Administrative Expense Claims that do not File such requests by the Administrative Expense Bar Date shall be forever barred from asserting such Administrative Expenses against the Debtor or Reorganized Debtor.

### 3.2. Priority Tax Claims.

Approximately $21,245 in Claims have been filed as Priority Tax Claims. The Debtor does not believe that there is a basis for these Claims. If the Debtor cannot reach a negotiated resolution of such Claims, the Debtor intends to object to such claims. To the extent that such Claims are Allowed, the Debtor will pay them in full on the later of (a) the Initial Distribution Date of the Plan, and (b) ten (10) business days following Allowance of such Claim(s) by Final Order.

## ARTICLE 4
## CLASSIFICATION OF CLAIMS AND INTERESTS

**4.1.**    Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Equity Interests in the Debtor. A Claim or Equity Interest is placed in a particular Class for the purposes of voting on this Plan and/or receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Equity Interest in that Class, and such Claim or Equity Interest has not been paid, released, or otherwise settled prior to the Distribution Date for such Claim or Equity Interest. In accordance with section 1123 (a)(1) of the Bankruptcy Code, Administrative Claims, and PriorityTax Claims of the kinds specified in sections 507 (a)(1) and 507(a)(8) of the Bankruptcy Code, respectively, have not been classified, and their treatment is set forth in Article 3 above.

The classification of Claims against and Equity Interests in the Debtor pursuant to thePlan are as follows:

| Class | Proposed Recovery | Claims/Interests | Status | Entitled to Vote |
|---|---|---|---|---|
| 1 | Paid in Full | Priority Non-Tax Claims | Unimpaired | No |
| 2 | Paid Pro Rata share of either $249,364 paid periodically over 3 ½ years as detailed below, | General Unsecured Claims | Impaired | Yes |

| | or (b) net sale proceeds up to the Face Amount of Allowed Class 2 Claims | | | |
|---|---|---|---|---|
| 3 | Maintain existing equity | Equity Interest | Unimpaired | No |

There have been no Secured Claims scheduled or Filed against the Debtors, so, no provision has been made for Secured Claims.

## ARTICLE 5
## TREATMENT OF CLASSES OF CLAIMS AND INTERESTS
## UNDER THE PLAN

The following treatment set forth in this Article 5 shall be accorded to Allowed Claims against the Debtor and Interests in the Debtor:

### 5.1.    Class 1:  Priority Non-Tax Claims.

Class 1 consists of Allowed Priority Non-Tax Claims held against the Debtor. On the Initial Distribution Date of the Plan, unless otherwise agreed by a Holder of a Priority Non-Tax Claim, each Holder of a Priority Non-Tax Claim shall be p a i d  in full in Cash.

The Debtor believes that there is one reclamation claim in this category in the amount of $1,126.08. The Debtor does not believe there are any other Priority Non-Tax Claims.

### 5.2.    Class 2:  General Unsecured Claims.

Class 2 consists of Allowed General Unsecured Claims. If the Debtor can sell its business pursuant to an offer which is received by the date that is twelve (12) months from the Confirmation Date for an amount that would net at least 10% more for Allowed Class 2 Creditors than $249,364, it will close the sale and distribute to each Holder of an Allowed Class 2 Claim its Pro Rata share of the net proceeds of the sale after payment of all costs of sale and current payables (including provision for taxes due upon the sale), Administrative Expenses, the KERP, and Allowed Priority Claims and Professional Fee Claims, up to the Face Amount of the Holder's Allowed Claim. The Debtor may close the sale without further order of the Bankruptcy Court if the Plan Ombudsman consents to the sale, but reserves the right to seek Bankruptcy Court approval of the sale and/or to run an auction process pursuant to §363 of the Bankruptcy Code. Debtor must seek Court approval of the sale if the Plan Ombudsman does not approve the sale.

In order to facilitate the sale, Debtor will request authorization to retain the services of Sherwood Partners, Inc., as sales agent by separate motion, which motion has already been filed with the Court [Docket No. 82]. Nothing in this Plan or such motion requires the Debtor to continue to employ Sherwood for more than six (6) months after the Effective Date of the Plan; provided, however, that the Debtor must consult with the Plan Ombudsman before terminating Sherwood's employment

17

To ensure that the Debtor is making a good faith effort to sell the company, the Plan Ombudsman shall remain in place for 12 months following the Initial Distribution Date to monitor the sale process and advise the Debtor with respect to same, subject to extension of such term as provided below in Section 7.4. The Plan Ombudsman shall receive regular updates on the sale process from both the Debtor and Sherwood, and may, but is not required to, participate in the sale negotiations if Sherwood believes it would be helpful. The Plan Ombudsman shall promptly notify the Court if he believes the Debtor is not making a good faith effort to sell the company.

Should the Debtor be unable to consummate such a sale pursuant to an offer received prior to that date which is twelve (12) months after the Effect Date, the Debtor will continue to operate its reorganized business and will make the following Distributions to General Unsecured Creditors on the dates indicated, each General Unsecured Creditor to receive its Pro Rata share of such Distribution:

| | |
|---|---|
| April 30, 2023 | $36,747 |
| January 31, 2024 | $30,000 |
| March 31, 2024 | $49,095 |
| August 31, 2024 | $57,000 |
| April 30, 2025 | $51,522 |
| September 30, 2025 | $25,000 |

The first Distribution may be delayed at the discretion of the Debtor, with the approval of the Plan Ombudsman, if the Debtor in good faith believes that a sale of the business is in prospect, and such payment shall not be deemed a late payment. In no event shall the first payment be delayed beyond August 31, 2023. In no event shall the first Distribution be delayed without the consent of the Plan Ombudsman.

Currently, there is approximately $571,803 of General Unsecured Claims either Scheduled or Filed against the Debtor. Although the Debtor hopes to reduce this amount through Claims Objections, should the entire amount be Allowed, the approximate Distribution to each Holder of an Allowed Class 2 Claim would be approximately 43.5 cents on the dollar. This would be the floor for distributions to Class 2. The Debtor hopes to increase the Distribution through a sale of the Debtor's Assets. The Debtor may prepay the amounts owed pursuant to this paragraph at any time after six months from the Confirmation Date without penalty or premium.

### 5.3.   Class 3:  Equity Interests

Class 3 consists of the Equity Interests in the Debtor. The Holder of the Equity Interest in the Debtor will maintain its Equity Interest unless the Debtor is sold. If the Debtor is sold, the Holder of the Allowed Equity Interest will receive any net proceeds from the sale in excess of the amounts necessary to pay for all costs of sale and current payables (including provision for taxes due upon sale), Administrative Expenses, Priority Claims, Professional Fee Claims, and the Face Amount of all Allowed General Unsecured Claims, if any.

The Reorganized Debtor will be prohibited from issuing any non-voting securities.

### 5.4.    Remedies for Non-Payment to Class 2.

Should the Debtor fail to make a payment to Class 2 General Unsecured Creditors when due, any General Unsecured Creditor may give written notice to the Debtor of such failure. Thereafter, the Debtor shall have thirty (30) days to cure such non-payment, or, if the Debtor does not agree that there has been a non-payment, to either resolve the matter or seek a court resolution. If the Debtor fails to either (a) cure the non-payment within thirty (30) days, (b) resolve the matter within thirty (30) days, or (c) obtain a court order that it has not missed a payment, then all future payments to Class 2 General Unsecured Creditor shall be increased by ten percent (10%), including the missed payment. Any Holder of a General Unsecured Claim shall be entitled to assert any remedy under any applicable law or this Plan with respect to any non-payment.

## ARTICLE 6
## ACCEPTANCE OR REJECTION OF THE PLAN

### 6.1.    Non-Voting Classes.

Class 1 will be paid in full on the Initial Distribution Date, and, therefore, is not Impaired. Class 3 maintains all of its Equity Interests, and, therefore, is not Impaired. Accordingly, Classes 1 and 3 are deemed to have accepted the Plan and do not vote on the Plan.

### 6.2.    Voting Classes.

Class 2 is Impaired under the Plan. The Holders of Class 2 Allowed Claims as of the Record Date for Voting shall be entitled to vote to accept or reject the Plan.

### 6.3.    Acceptance by Impaired Classes of Claims and Interests.

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims entitled to vote to accept or reject the Plan has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan. An Impaired Class of Interests entitled to vote to accept or reject the Plan has accepted the Plan if the Holders of at least two-thirds in amount of the Interests actually voting have voted to accept the Plan. If all of the Holders of Claims in an Impaired Class do not vote at all, the Plan Proponent reserves the right to request that the Court deem such Impaired Class to have accepted the Plan.

## ARTICLE 7
## MEANS OF IMPLEMENTATION OF THE PLAN

### 7.1.    Conditions Precedent to the Effective Date.

The following are conditions precedent to the Effective Date that must be satisfied or waived by the Plan Proponent:

      a.    Entry of the Confirmation Order and the Confirmation Order having become a Final Order.

      b.    No request for revocation of the Confirmation Order under section 1144 of

the Bankruptcy Court shall be pending.

    **c.**    The Debtor has obtained approval from the Bankruptcy Court for a sales agent for the Debtor's Assets.

### 7.2.    Vesting of Assets of the Estate.

On the Effective Date, subject only to the terms of this Plan, all Assets of the Debtor and the Estate, wherever situated, shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, encumbrances, and interests except as otherwise provided in the Plan.

### 7.3.    Marketing of the Debtor's Assets

The Debtor intends to aggressively market the Debtor's Assets for sale. The Debtor has interviewed numerous potential sales agents, but has had difficulty attracting a quality sales agent due to the relatively small size of the transaction. The Debtor has reached an agreement, however, to retain Sherwood Partners, Inc., a recognized sales agent in the distressed arena. Sherwood was particularly attractive to the Debtor because, with its headquarters in Silicon Valley, it has great experience in selling technology companies. The Debtor filed an application to retain Sherwood Partners as the exclusive sales agent for the Debtor on January 18, 2022, [Docket No. 82], but has adjourned the hearing in order to coincide with the Confirmation hearing. Although one should look to the engagement letter attached to the motion for the full terms of the engagement, the terms include: (a) a small down payment, which would be credited against the success fee, (b) all approved expenses, (c) a monthly fee (which may be accrued and paid from the proceeds of the sale if the Debtor does not have current cash available) of $7500 a month for the first three months, and $3,750 per month for each month thereafter, and (d) a success fee of 10% of the proceeds of the sale. Sherwood will begin to aggressively market the Debtor for sale as soon its retention is approved by the Bankruptcy Court.

The Debtor intends to sell its assets free and clear of all liens, claims, and encumbrances. The Debtor may sell its assets without further order of the Court pursuant to this Plan, but reserves the right to either seek court approval of a sale or sell its assets through an auction procedure pursuant to § 363 of the Bankruptcy Code. In either case, the Debtor will consult with the Plan Ombudsman as to the method of the proposed sale.

The Reorganized Debtor will operate the business until such time as the Debtor can be sold, or if it is not sold, until the payments under the Plan are made.

### 7.4.    Plan Ombudsman.

As set forth above, the Plan Ombudsman will monitor the sale process to ensure a good faith effort is being made to sell the company, and he will be available to consult with the Debtor and Sherwood concerning the sale. The Debtor and Sherwood will inform the Plan Ombudsman of all indications of interest and offers received, and will advise the Plan Ombudsman regularly on the progress of the sale. They will provide the Plan Ombudsman with all information he may reasonably request regarding the efforts to sell the Debtor's assets. The Plan Ombudsman must consult with the Debtor as to the appropriate sale process. In addition, the Plan Ombudsman must consent to any termination of Sherwood Partners prior to 12 months from the Effective Date, as well as to any delay in the first payment to General

Unsecured Creditors due to a sale being in prospect. The Plan Ombudsman shall be entitled, but not required, to communicate with holders of Claims about the sale process in general, so long as, the Plan Ombudsman does not violate the terms of any Non-Disclosure Agreement which the Debtor has signed with any prospective buyer. The Plan Ombudsman has the duty to inform the Bankruptcy Court at any time that he feels the Debtor is not conducting a good faith sales effort.

The term of the Plan Ombudsman shall commence on the Initial Distribution Date and shall continue until the earlier of (a) 12 months following the Effective Date, or (b) the consummation of the sale of substantially all of the Debtor's assets; provided, however, if an offer to purchase the company is either being negotiated or has been accepted, but the sale has not yet closed by the time the term would otherwise expire, the term shall be extended through the close of such sale.

The Plan Ombudsman shall be compensated at his normal hourly rate within 30 days of presentment of reasonable invoices without the need for further order of the Court. Nothing in this paragraph shall be construed to prevent the Debtor from questioning any invoice which it does not believe is correct.

This Plan constitutes the Debtor's request that Salvatore LaMonica be appointed as the Plan Ombudsman as of the Initial Distribution Date. The Debtor believes that this Plan will be substantially consummated on the Initial Distribution Date, and that the current services of Mr. LaMonica as Subchapter V Trustee will terminate as of the Initial Distribution Date pursuant to Bankruptcy Code §1183(c).

### 7.5.    Corporate Governance.

On the Confirmation Date, Lisa Lederer will resign as CEO, but will remain as the sole director of the Debtor without salary or director fees. As the sole director, she will continue post-Confirmation, to get her health insurance through the Debtor at the Debtor's expense. Upon Ms. Lederer's resignation, Martin Lydon, the current COO, will assume the duties of President and CEO at his current annual salary of $175,000. In addition, under his employment contract, Mr. Lydon receives full healthcare coverage including medical, dental, and vision at the expense of the Debtor, as well as reimbursement for out-of-pocket related medical expenses; participation in all Magnacoustics employee benefits, including paid time off, sick leave, and holidays; four weeks of annual vacation; reimbursement of business expenses and provision of a business computer and business phone; all business travel and commuting expenses; $4000 annual allowance for education and attendance at conferences; $2000 annual allowance for membership fees to professional organizations; $8000 annual wellness and fitness allowance; and six months severance if terminated without cause. Mr. Lydon has an employment agreement with the company, the term of which recently expired, but stated benefits have continued. The Debtor intends to renew the employment contract shortly on the same or similar terms.

Upon Mr. Lydon's assumption of his new duties, Caroline Galeotafiore, the current Administration and Operations Manager, will assume the duties of Chief Operating Officer at her current salary of $90,000 annually. Ms. Galeotafiore is also eligible for all of the customary Magnacoustics employee benefits, including paid time off, sick leave, holidays, vacation, reimbursement of business expenses, and the like. Ms. Galeotafiore has been an integral part of the reorganization process and has been in charge of managing all business operations, including administrative, human resources, coordinating production, implementing systems for increased efficiency, and setting the framework for a

successful sales strategy. Her ability to speak several languages has been instrumental in the company's recent expansion into foreign markets. She has a bachelor's degree in business from Western Connecticut State University and worked for the City of New York in business and community development for five years prior to coming to Magnacoustics. Ms. Galeotafiore will continue with most of her current duties, as well as taking on additional duties as Chief Operating Officer.

The Debtor has no other officers.

### 7.6. Key Employee Retention Plan.

As the Debtor has trimmed its personnel to cut costs during the Case, every person now with the company is critical to operations. In order to maintain a going concern and maximize value, the Debtor needs to maintain all of its current employees, which is a difficult task given that the employees know that the company is for sale, and that they are being asked to work themselves out of a job. Furthermore, the environment for employees in the US currently is such that employees are readily leaving their jobs and finding new jobs. Accordingly, the Debtor believes that it is imperative in order to maximize value that it incentivize its employees to stay through the sale pursuant to a Key Employee Retention Plan. This Reorganization Plan constitutes the Debtor's request that the Court approve such Key Employee Retention Plan. The KERP has the following features:

1. Each employee participating in the KERP will be paid a bonus upon the closing of the sale of the company from the proceeds of the sale. Such bonuses will constitute Allowed Administrative Claims.

2. Employees will only be eligible for bonuses if they continue in their employment on terms at least as favorable to the Debtor as their current terms through either the date of a sale, or such earlier date as they are asked by the Debtor to terminate employment due to the impending sale. Any employee who resigns prior to such time, or is terminated by the Debtor for any reason other than the impending sale, is not eligible for a bonus.

3. The KERP will be terminated upon the earlier of (a) a sale event which triggers the payment of the bonuses, or (b) October 1, 2025, after the last payment has been made under the Plan. Upon termination of the KERP, the Debtor will owe no bonuses to any employees and no employees will have any continuing rights pursuant to the KERP.

4. The participants in the KERP will be divided into three tiers. Tier 1 consists of the most critical employees, and such employees will be entitled to a bonus equivalent to three months of their base salary at the time of sale. Tier 2 consists of the next most critical employees, who will be entitled to a bonus equivalent to two months of their base salary at the time of sale. Tier 3 consists of the next most critical employees who will be entitled to a bonus equivalent to two weeks of their base salary at the time of sale.

5. Should any employee receive a raise within 90 days prior to a sale, the bonus will be based on their base salary prior to such raise.

6. Should any employee resign or be terminated prior to the sale event, and such employee is replaced by the Debtor with a new employee, such new employee is eligible for the KERP,

but must be placed in a tier equal or lower to the tier of the terminated employee.

7. The Debtor cannot add new participants to the KERP unless such new participant is replacing someone who has left the company and is no longer eligible for a KERP bonus.

The KERP participants, their position, their Tier, and their bonus based on their current base salary are as follows:

**Tier 1.**

| NAME | POSITION | BONUS |
|------|----------|-------|
| C. Galeotafiore | Currently Administrative & Operations, becoming COO upon confirmation | $23,625.00 |
| M. Lydon | Currently COO, becoming CEO upon confirmation | $43,750.00 |
| B. Pfisterer | Product and Sales Manager | $19,687.50 |
| F. Shah | Quality and Regulatory Manager | $21,000.00 |

**Tier 2.**

| NAME | POSITION | BONUS |
|------|----------|-------|
| P. Hugo Idrogo Cerdan | Assembly and Inventory Supervisor | $10,053.33 |

**Tier 3.**

| NAME | POSITION | BONUS |
|------|----------|-------|
| B. Henry | Product Assembler | $1,680.00 |
| V. Pack | Administrative & Operations Assistant | $2,115.38 |

| TOTAL | $121,911.21 |
|-------|-------------|

### 7.7    Source of Payments; Projections in Support of Debtor's Ability to Make Payments Under the Proposed Plan

The Debtor has prepared cash projections based on its current business plan, as well as pro forma profit and loss statements, which support its ability to make the payments due under the Plan. The cash flow projections are attached hereto as **Exhibit 2**. The pro forma profit and loss statements are attached hereto as **Exhibit 3.**

Exhibits 2 and 3 assume that the Reorganized Debtor operates for 3 ½ fiscal years. If, instead, the Debtor is sold in order to maximize the return to Creditors, the source of payments will be the proceeds from such sale.

You should consult with your own accountant or other financial advisor if you have any questions pertaining to these projections.

### 7.8    Preservation of Causes of Action.

(a)    Except as expressly provided in the Plan, and unless expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Confirmation Order, any Final Order, or in any contract (including a contract of sale of the Debtor's Assets), instrument, release or other agreement entered into or delivered in connection with the Plan, the Reorganized Debtor shall exclusively retain and may enforce, as the representative of the Estate under § 1123(b)(3)(B), and the Debtor expressly reserves and preserves for these purposes, in accordance with §§ 1123(a)(5)(B) and 1123(b)(3) of the Bankruptcy Code, any claims, demands, rights, and Causes of Action that the Debtor or the Estate may hold against any Person or Entity, including Avoidance Actions, which shall vest in the Reorganized Debtor. Accordingly, no preclusion doctrine, including,without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action by virtue of, or in connection with, the Confirmation, consummation, or effectiveness of this Plan. The Reorganized Debtor or its successors or assigns exclusively may pursue such retained claims, demands, rights, and Causes of Action.

(b)    With respect to any Avoidance Action that the Debtor or Reorganized Debtor abandons, they expressly reserve all rights, including the right under section 502(d) of the Bankruptcy Code to use defensively the abandoned Avoidance Claim as a basis to object to all or any part of a Claim against the Estate asserted by a creditor which remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

### 7.9.    Exemptions from Certain Transfer Taxes and Recording Fees

Pursuant to § 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any recording tax, stamp tax, conveyance, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales tax, use tax, or other sought-after government for assessment to the fullest extent contemplated by § 1146, and upon entry of the Confirmation Order, the appropriate state or local governmental official for a conference structure to forgo the collection of any such tax or governmental assessment and except for filing and recordation any of the foregoing or other documents without the payment of any such tax or governmental assessment. A copy of the Confirmation Order shall serve as evidence that the Debtor is not required to pay any such governmental assessment.

### 7.9.    Nonconsensual Confirmation

If the Plan Proponent fails to meet the requirements for Confirmation of the Plan pursuant to §1191(a), the Plan Proponent reserves the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan pursuant to § 1191(b) of the Bankruptcy Code, or both.

### 7.10.    Discharge.

If the Plan is confirmed pursuant to § 1191(a), on the Confirmation Date of this Plan, the Debtor will be discharged from any debt that arose before Confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d) of the Bankruptcy Code. If the Plan is confirmed

pursuant to § 1191(b), as soon as practicable after completion by the Debtor of all payments due under the Plan, the Court shall grant the Debtor a discharge of all debts provided in §1141(d)(1)(A) of the Bankruptcy Code, and all other debts allowed under § 503 of the Bankruptcy Code and provided for in the Plan, except any debt on which the last payment is due after the first three years of the Plan.

### 7.11.    Tax Consequences of the Plan.

Creditors and Equity Interest Holders concerned with how the plan may affect their tax liability should consult with their own accountants, attorneys, and/or tax advisors.

The tax consequences for the Debtor are unknown at this time and will depend on whether the Debtor is sold or continues as a reorganized business.

## ARTICLE 8
## DISTRIBUTIONS

### 8.1.    Payment Up to Allowed Claim.

Except as otherwise specifically provided in the Plan, no Holder of a Claim shall be entitled to receive Distributions aggregating more than its Allowed Claim, nor shall any Holder of a Claim receive any Distributions under the Plan until its Claim has been Allowed.

### 8.2.    Distributions.

Distributions to Holders of Allowed Claims shall be made: (a) at the addresses set forth on the Proofs of Claim filed by such Holders (or at the last known addresses of such Holders if no Proof of Claim is filed or if the Debtor has been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Debtor after the date of any related Proof of Claim, or (c) at the addresses reflected on the Schedules if no Proof of Claim has been filed, and the Debtor has not received a written notice of a change of address. If any Distribution to a Holder of an Allowed Claim is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Debtor is a notified in writing of such Holder's then current address, at which time all missed Distributions shall be made to such Holder without interest. Any undeliverable Distribution made shall be held for redistribution under this Plan. All Claims for undeliverable Distributions must be made no later than 90 days after the Distribution is made, after which date all Unclaimed Property and uncashed checks for any reason shall revert to the Debtor free of any restrictions thereon, and the Claim of any Holder or successor to such Holder with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require the Debtor or any professional retained by the Debtor to attempt to locate any Holder of an Allowed Claim.

### 8.3.    Distribution Agent.

Assuming the Plan is confirmed pursuant to § 1191(a) of the Bankruptcy Code, payments to Creditors provided for in the Plan will be made by the Reorganized Debtor.

### 8.4.    Disputed Claims Reserves.

On any date that Distributions are to be made on account of Allowed Claims and after making all Distributions to be made on any such date under the Plan, the Debtor shall make a reasonable reserve on account of Disputed Claims and shall adjust the reserve periodically, which shall be no less than the Face Amount of the Disputed Claims multiplied by the Pro Rata Distributions that have been made on account of Allowed Claims as of such date. Such Disputed Claim Reserve shall be administered by the Reorganized Debtor. The Reserve shall be closed and extinguished upon the determination that all Distributions and other dispositions of Cash, or other Distributions required to be made under the Plan have been made in accordance with the terms of the Plan, and all Claims have either been Allowed, Disallowed, or withdrawn. Upon closure of the Disputed Claim Reserve, all Cash in the Disputed Reserve shall be subject to redistribution, in accordance with the provisions of the Plan.

### 8.5.    Estimation of Claims.

The Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claims, including any Claim for taxes, to the extent permitted by § 502(c) of the Bankruptcy Code regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 8.6.    Objections.

Prior to the Effective Date, the Debtor shall have the right to make and File objections toClaims; provided, however, to the extent that the Objection is not finally determined prior to the Effective Date, the Objection will be a Cause of Action that vests with the Reorganized Debtor, and may continue to be pursued only by the Reorganized Debtor. The Reorganized Debtor shall have the right to make and to File objections at any time prior to the three-month anniversary of the Effective Date (the "Claims Objection Deadline"). All objections shall be litigated to Final Order unless approval of a settlement or compromise of a Claim Objection is obtained pursuant to Bankruptcy Rule 9019; provided, however, the Reorganized Debtor has authority to compromise, settle, otherwise resolve, or withdraw any objection without further order of the Bankruptcy Court.

### 8.7.    Updates to Claim Register Without Objection.

Any Proof of Claim that has been paid or satisfied, in whole or in part, or any Proof of Claim that has been amended or superseded, may be marked as satisfied, in whole or in part, or amended (as applicable) on the Claims Register at the directions of the Debtor, without a Claims Objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided,*

that the Debtor shall provide 30 days' notice of any of the foregoing modifications to the Claims Register to the Holder of any affected Claims during which period the Holder may object thereto.

### 8.8.    Fractional Cents.

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under thePlan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down. No distributions of less than $10.00 will bemade on account of Allowed Claims and Interests.

### 8.9.    Setoffs.

Except as otherwise provided in the Plan, the Trustee may set off against any Claim and the Distributions to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever that the Debtor may have against the Holder of such Claim, but neither the failure todo so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor of any right of setoff against the Holder of such Claim. Any set off to be imposed by the Debtor must be on notice to the party against whom the setoff is proposed to be imposed, and suchparty must have an opportunity to object to the setoff. If the parties cannot resolve the setoff consensually, jurisdiction is reserved to the Bankruptcy Court to hear the setoff matter.

### 8.10.    Time Bar to Cash Payments by Check.

Checks issued by the Reorganized Debtor on account of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) days after the date of issuance thereof, except those returned as undeliverable which shall be dealt with in accordance with Section 8.2. of the Plan. After such date, all Claims in respect of void checks shall be forever barred, and the proceeds of such checks shall revest in the Reorganized Debtor and be subject to redistribution, as appropriate, in accordance with the provisions of the Plan.

## ARTICLE 9
## EXECUTORY CONTRACTS UNDER THE PLAN

### 9.1.    Rejection of Executory Contracts.

All Executory Contracts (other than those previously rejected or assumed and assigned pursuant to an order of the Bankruptcy Court) shall be deemed rejected on the Effective Date or such other date as may be agreed to by the Debtor and the counterparties thereto or ordered by the Bankruptcy Court, and the Debtor and respective counterparties shall be relieved of any further obligation to perform under such agreements. Rejected Contract counterparties who do not oppose this proposed treatment by opposing Confirmation of the Plan by filing and serving a written objection with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules shall be deemed to have consented to rejection of such Executory Contract. This Plan shall constitute a request pursuant to Bankruptcy Code Sections 1123(b)(2) and 365(a) and the Confirmation Order (except as otherwise provided therein) shall constitute an order of the Bankruptcy Court approving the rejection by the Debtor of all Executory

Contracts that have not otherwise been rejected or assumed by order of the Bankruptcy Court.

### 9.2.    Rejection Claims.

If the rejection of a Rejected Contract gives rise to a Claim by the counterparty or parties to such contract or lease, such Claim shall be classified as a Class 3 General Unsecured Claim; provided, however, that any Claim arising from the rejection of a Rejected Contract pursuant to this Article 9 shall be forever barred and shall not be enforceable against the Debtor, the Estate, or their properties, unless a proof of Claim is Filed and served on the Debtor by the Rejection Claims Bar Date.

### 9.3.    Assumption Prior to Entry of the Confirmation Order.

Prior to the Confirmation Hearing, the Debtor may designate certain executory contracts and unexpired leases which it wishes to assume at Confirmation, rather than reject. The Plan Supplement will contain a Cure Notice listing all such executory contracts and unexpired leases which the Debtor wishes to assume at Confirmation, along with the proposed Cure. Such Cure Notice will be served by the Debtor on all counterparties to the executory contracts and unexpired leases which the Debtor wishes to assume. Counterparties who oppose the assumption may do so by opposing Confirmation of the Plan by filing and serving a written objection with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules. Failure to file such an objection shall be deemed consent to assumption of such Executory Contract. With respect to the Cure Amount, counterparty shall have fourteen (14) days from service of the Cure Notice to file any objection to the Cure Amount, whether or not such party has previously filed an objection to assumption of the executory contract or unexpired lease.

### ARTICLE 10
### RETENTION OF SUBJECT MATTER
### <u>JURISDICTION AND CAUSES OF ACTION</u>

### 10.1.    Retention of Subject Matter Jurisdiction.

The Bankruptcy Court shall continue to have subject matter jurisdiction of all matters, and over all Persons, arising out of, and relating to, the Chapter 11 Case and the Plan pursuant to, andfor the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things,the following purposes:

   a.    To consider and rule on the compromise and settlement of any Claim against or Causes of Action on behalf of the Debtor or the Estate;

   b.    To ensure that Distributions to Holders of Allowed Claims are accomplished as provided in the Plan;

   c.    To hear and determine any timely objections to Administrative Expense Claims or to proofs of claim filed, both before and after the Effective Date, including any objections to the classification of any Claim or Equity Interest, and to Allow or Disallow any Claim, in whole or in part;

   d.    To hear and determine any and all applications for the allowance of Professional Fees accrued prior to the Effective Date as provided for in the Plan;

   e.    To hear and rule upon any motion to approve a sale of some or all of the Debtor's assets

and to enter orders implementing same;

f.     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

g.     To issue such orders in aid of execution of the Plan, in accordance with section 1142 of the Bankruptcy Code;

h.     To estimate Claims for all purposes under the Plan;

i.     To consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in the Plan, including any exhibit thereto, or in any order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan and to implement and effectuate the Plan;

j.     To hear and determine matters concerning state, local and federal taxes, including but not limited to those in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, with respect to the Debtor or any Person;

k.     To compel the conveyance of property and other performance contemplated under the Plan and documents executed in connection herewith;

l.     To enforce remedies upon any default under the Plan;

m.     To enforce, interpret and determine any disputes arising in connection with any orders, stipulations, judgments and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

n.     To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan and the documents ancillary thereto, or any Person's obligations incurred in connection therewith;

o.     To determine any other matters that may arise in connection with or relate to the Plan, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with Plan, including, without limitation, any agreement to sell some or all of the Assets of the Debtor;

p.     To issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the occurrence of the Effective Date or enforcement of the Plan;

q.     To issue such orders as may be necessary or appropriate in aid of Confirmation and/or to facilitate consummation of the Plan;

r.     To determine such other matters as may be provided for in the Confirmation Order or other orders of the Bankruptcy Court as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

s.    To hear and determine (a) all motions, applications, adversary proceedings, and contested and litigated matters pending on the Effective Date, and (b) all Claims by or against the Debtor arising under the Bankruptcy Code or non-bankruptcy law, if made applicable by the Bankruptcy Code, whether such Claims are commenced before or after the Effective Date, including, but not limited to, Causes of Action;

t.    To hear and determine any Claims asserted by: (i) suppliers of goods or services to any of the Debtor; and (ii) any shareholder, Insider or affiliate of the Debtor, for any actions or omissions prior to the Commencement Date;

u.    To hear and determine any other matter authorized by applicable law; and

v.    To enter a Final Decree.

**10.2.    Retention of Causes of Action.**

The Plan preserves all Causes of Action, and provides for them to vest in the Reorganized Debtor on the Effective Date of the Plan.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtor (as successor to the Debtor and the Estate) shall retain and have the exclusive right to enforce againstany Entity any and all Causes of Action of the Debtor or its Estate, including, without limitation, all Avoidance Actions, all actions assigned to the Debtor.

**PLEASE TAKE NOTICE THAT ALL CAUSES OF ACTION OF THE DEBTOR AND ITS ESTATE, WHETHER OR NOT SPECIFIED HEREIN, WILL BE PRESERVED AND TRANSFERRED TO THE REORGANIZED DEBTOR PURSUANT TO THE PLAN.**

**THE LACK OF DISCLOSURE OF ANY PARTICULAR CAUSE OF ACTION SHALL NOT CONSTITUTE, NOR BE DEEMED TO CONSTITUTE, A RELEASE OR WAIVER OF SUCH CAUSE OF ACTION, AS THE PLAN PROPONENT INTENDS FORTHE PLAN TO PRESERVE AND TRANSFER TO THE REORGANIZED DEBTOR ANY AND ALL CAUSES OF ACTION HELD BY THE DEBTOR AND ITS ESTATE AS OF THE EFFECTIVE DATE OF THE PLAN.**

## ARTICLE 11
## MODIFICATION OF PLAN

**11.1.    Prior to the Confirmation Order.**

The Plan Proponent may alter, amend, or modify the Plan or any exhibits thereto under § 1193(a) of the Bankruptcy Code at any time prior to entry of the Confirmation Order. The Plan Proponent shall provide parties-in-interest with notice of such amendments or modifications as may be required by the Bankruptcy Code or Bankruptcy Rules or order of the Bankruptcy Court.A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or clarified, if the proposed alteration, amendment, modification or clarification does not materially and adversely change the treatment of the Claim of such Holder.

## ARTICLE 12
## PROVISIONS REGARDING INJUNCTIONS,
## <u>EXCULPATION AND RELEASES</u>

**12.1 Injunction Relating to the Plan.**

To the fullest extent provided in the Bankruptcy Code, as of the Effective Date, all Persons that have held, currently hold, or may hold a Claim or other debt or Liability or Interest that is addressed in the Plan are permanently enjoined from taking any action on account of such Claims, debts, Liabilities, or interest, other than actions brought to enforce any rights or obligations under the Plan.

**12.2. Releases.**

**a.** ***<u>Debtor's Release of Claims Against Officers, Directors, and Professionals of the <u>Debtor</u>.</u>*** **As of the Effective Date, Debtor shall be deemed to have released all claims in connection with or related to any action or omission taking place on or after the Commencement Date and prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case, and/or the Plan, against the Debtor's present directors, officers, financial advisors, attorneys and professionals; provided, however, the foregoing shall not waive or release any causes of action arising out of (i) any contractual obligations owing by any such party, (ii) any Avoidance Actions, or (iii) the fraud, willful misconduct, gross negligence, breach of fiduciary duty, ultra vires acts, malpractice, misuse of confidential information that causes damages, or criminal conduct of any such party.**

**b.** ***<u>No Release Prior to Petition Date</u>.*** **For the avoidance of doubt and notwithstanding anything to the contrary in this Plan or otherwise, nothing herein shall release any claims that arose prior to the Petition Date against the Debtor's Principals or any related parties, or affiliates of the Debtor.**

**12.3. Exculpation.**

**To the extent permitted by Section 1125 (e) of the Bankruptcy Code, as of the Effective Date, the Debtor is hereby released and exculpated from, any Exculpated Claim or obligation, cause of action or liability for any Exculpated Claim, except for acts undertaken in bad faith, fraud, gross negligence, willful misconduct, breach of fiduciary duty, ultra vires acts, malpractice, misuse of confidential information that causes damages, or criminal conduct; but in all respects the Debtor shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities under this Plan, and in its dealings in the context of the Debtor's Chapter 11 Case. No Holder of a Claim or Equity Interest or any other party-in-interest, including their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, shall have any right of action against the Debtor relating to, or arising out of, the Exculpated Claims, except for the Debtor's own willful misconduct or gross negligence; provided, however, that nothing in the Plan shall, or shall be deemed to, release or exculpate the Debtor with respect to their obligation or covenants arising pursuant to the Plan.**

## ARTICLE 13
## <u>FEASIBILITY OF THE PLAN</u>

### 13.1.    Feasibility.

The Bankruptcy Court must find that Confirmation of the Plan is feasible and not likely to be followed by the need for further reorganization. The Plan Proponent believes that the Debtor will have enough cash on hand on the Initial Distribution Date to pay all of the Claims and expenses that are entitled to be paid on that date. This belief is supported by the Cash Flow Projections attached hereto as Exhibit 2, and the pro forma profit and loss projections attached hereto as Exhibit 3. Therefore, all of the initially required payments are feasible.

Future payments under the Plan are dependent on either the operations of the Reorganized Debtor or a sale of the Reorganized Debtor's Assets. The Cash Flow Projections attached hereto as Exhibit 2 demonstrate that the Debtor will have sufficient income to make all of the payments required under the Plan if there is not a sale of Assets.

[*Remainder of page intentionally left blank.*]

## ARTICLE 14
## LIQUIDATION VALUATION

### 14.1.  Liquidation Analysis.

To confirm the Plan, the Bankruptcy Court must find that all Holders of Claims and Equity Interests who do not accept the Plan will receive at least as much under the Plan as such Claimants and Equity Interests Holders would receive in a Chapter 7 liquidation. The Liquidation Analysis as of March 31, 2022, attached hereto as **Exhibit 1** demonstrates that this is the case.

## ARTICLE 15
## MISCELLANEOUS PROVISIONS

### 15.1.  Governing Law.

EXCEPT TO THE EXTENT THAT THE BANKRUPTCY CODE OR OTHER FEDERAL LAW IS APPLICABLE, OR TO THE EXTENT A SCHEDULE OR EXHIBIT HERETO OR INSTRUMENT, AGREEMENT OR OTHER DOCUMENT EXECUTED UNDER THE PLAN PROVIDES OTHERWISE, THIS PLAN, THE RIGHTS, DUTIES AND OBLIGATIONS ARISING UNDER THIS PLAN, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS PLAN, AND THE TRANSACTIONS CONTEMPLATED BY THIS PLAN (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH, THE INTERNAL LAWS OF NEW YORK WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

### 15.2.    Notices.

All notices, requests and demands to be effective shall be in writing (including by facsimile transmission and email) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtor:

Mayerson & Hartheimer, PLLC. 845 Third Ave., 11th floor
New York, NY 10022
Attn: Sandra E. Mayerson, Esq. David H. Hartheimer, Esq.
Email:  sandy@mhlaw-ny.com
          david@mhlaw-ny.com

with a copy to their temporary address:
48 Seneca St.,
Dobbs Ferry, NY 10522

To the Subchapter V Trustee or
Plan Ombudsman

Salvatore LaMonica, Esq.
LaMonica Herbst Maniscalco LLP
3305 Jerusalem Ave
Wantagh, NY 11793
Email: sl@lhmlawfirm.com

### 15.3.    Reservation of Rights.

If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and does not become effective, the rights of all parties in interest in the Bankruptcy Case are and shall be reserved in full. Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Bankruptcy Case shall be bound or deemed prejudiced by any such concession or settlement. **Binding Effect.**

The rights, benefits and obligations of any Person named or referred to in the Plan, or whose actions may be required to effectuate the terms of the Plan, shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person.

### 15.4.    Final Decree.

Once the Estate has been fully administered, as provided in Bankruptcy Rule 3022, the Debtor, or such other party as the Bankruptcy Court shall designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the Case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

Dated:  May 31, 2022

**DEBTOR:**

MAGNACOUSTICS, INC.

By*: S/ Lisa Lederer*
Name:  Lisa Lederer
Its: Chief Executive Officer

# EXHIBIT I

**Magnacoustics**
**Liquidation Analysis**
**Financial information as of 03.31.22**

| Assets | | Book Value | Rec. % | Rec. $ | Notes |
|---|---|---|---|---|---|
| | Cash | 351,096 | 100% | 351,096 | A |
| | Accounts receivable | 307,912 | (see note F) | 273,063 | B, F |
| | Fixed Assets, net | 21,951 | (see note C) | - | C |
| | Prepaid Expenses | - | (see note D) | - | D |
| | Other Assets | 10,028 | 0% | - | E |
| | | | | | |
| **Gross Proceeds from Liquidation** | | | | 624,160 | |
| **Administrative claims** | | | | | |
| | Trustee Fees | | - | 24,250 | |
| | Trustee Professionals | | | 50,000 | |
| | Post-petition rent and other | | | 6,000 | J |
| | Priority claims | | | 22,371 | |
| | Administrative costs  - Professional fees incurred in Chapter 11 | | | 391,885 | |
| | Wind-down costs | | | 25,000 | G |
| | Total Liquidation expenses | | | 519,506 | |
| | | | | | |
| **Net Proceeds Available for Priority & Unsecured Claims** | | | | | |
| | Secured Claims | | 100% | - | H |
| | | | | | |
| **Net Proceeds Available for Unsecured Claims** | | | | 104,654 | |
| | | | | | |
| **Total Unsecured Claims as of Balance Sheet Date** | | | | 571,812 | I |

**A**  Cash balances as of March 31, 2022.

**B**  Gross Balance as of March 31, 2022, less allowance for doubtful accounts

**C**

| Fixed Asset | NBV | Recoverability Estimate | Net Recoverable Amount | Notes |
|---|---|---|---|---|
| Computer Equipment | | | | Equipment is substantially depreciated, therefore assume technology is essentially obsolete and would provide immaterial value (if any) upon liquidation |
| | 13,454 | 0% | - | |
| Transportation Equipment | | | | Vehicle was in an accident and totaled by insurance company. |
| | - | 65% | - | |
| Leasehold Improvements | | | | Leasehold improvements assumed to be abandoned upon liquidation |
| | 8,497 | 0% | - | |
| Total | 21,951 | | - | |

**D**  No prepaid expenses at March 31, 2022

**E**  Other assets are comprised of $5,000 in landlord security deposits, and $5,000 in utility company deposits. Both amounts would be expected to be non-recoverable. The landlord would keep the security deposit, as in a liquidation the lease would be terminated early.  The utility companies would apply the security deposits to the final billings when accounts are disabled.

**F**  Accounts Receivable recoverability are based on aging of receivables as of the filing date.

| Aging | Balance at Filing | Recoverability | Liquidation Amount |
|---|---|---|---|
| >90 | 36,484 | 20% | 7,296.72 |
| 60-90 | 14,556 | 85% | 12,372.29 |
| 30-60 | 30,832 | 95% | 29,290.74 |
| 1-30 | 38,748 | 95% | 36,811.01 |
| Current | 187,292 | 100% | 187,292.36 |
| | 307,912 | | 273,063 |

**G**  Wind down cost estimate includes operating costs incurred during liquidation including collection of AR, HR, obtaining runoff insurance, etc.  Assumption is wind-down of Company would take approximately 1 month to complete.

**H**  No secured liabilities, as of the balance sheet date

**I**  General unsecured claims represent the total nonpriority unsecured claims as filed with the Court on Form 206Sum.

**J**  Rent expense of approximately $6k, inclusive of estimated utility costs, over the assumed 1-month wind-down period.

**<u>EXHIBIT 2</u>**

**Magnacoustics Inc.**
**Proforma - Cash Flow - Cash Basis**
**For the Year Ended March 31, 2023**

| | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance - 3/31/22 | 274,882 | 126,269 | 142,464 | 171,812 | 201,161 | 230,509 | 259,857 | 289,205 | 267,143 | 296,921 | 160,246 | 190,024 |
| Inflow | 191,450 | 205,500 | 225,430 | 225,430 | 225,430 | 225,430 | 225,430 | 226,080 | 226,080 | 226,080 | 226,080 | 226,080 |
| Total Inflow | 191,450 | 205,500 | 225,430 | 225,430 | 225,430 | 225,430 | 225,430 | 226,080 | 226,080 | 226,080 | 226,080 | 226,080 |
| OutFlow | | | | | | | | | | | | |
| COGS | (65,093) | (69,870) | (76,646) | (76,646) | (76,646) | (76,646) | (76,646) | (76,207) | (76,867) | (76,867) | (76,867) | (76,867) |
| Overhead | (119,436) | (119,436) | (119,436) | (119,436) | (119,436) | (119,436) | (119,436) | (171,936) | (119,435) | (119,435) | (119,435) | (119,435) |
| Total outflow | (184,529) | (189,306) | (196,082) | (196,082) | (196,082) | (196,082) | (196,082) | (248,143) | (196,302) | (196,302) | (196,302) | (196,302) |
| Net cash from operations | 6,922 | 16,195 | 29,348 | 29,348 | 29,348 | 29,348 | 29,348 | (22,063) | 29,778 | 29,778 | 29,778 | 29,778 |
| Other items affecting cash flow: | | | | | | | | | | | | |
| Collections on Pre-filing AR | - | - | - | - | - | - | - | - | - | - | - | - |
| Pymts of pre-confirmation Professional fees | (133,163) | - | - | - | - | - | - | - | - | (166,454) | - | - |
| Priority claims | (22,371) | - | | | | - | | - | | - | | - |
| Pymts of disposable income | - | - | - | - | - | - | - | - | - | - | - | - |
| | (155,534) | - | - | - | - | - | - | - | - | (166,454) | - | - |
| Ending cash balances | 126,269 | 142,464 | 171,812 | 201,161 | 230,509 | 259,857 | 289,205 | 267,143 | 296,921 | 160,246 | 190,024 | 219,802 |
| Operating reserves: | | | | | | | | | | | | |
| Payroll | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | (53,055) |
| Overhead | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | (130,000) |
| | - | - | - | - | - | - | - | - | - | - | - | (183,055) |
| Disposable Income | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 36,747 |

**Magnacoustics Inc.**
**Proforma - Cash Flow - Cash Basis**
**For the Year Ended March 31, 2024**

| | | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | Jan-24 | Feb-24 | Mar-24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance - 3/31/23 | | 219,802 | 201,713 | 220,370 | 239,028 | 257,685 | 276,343 | 232,581 | 252,238 | 228,127 | 260,821 | 263,515 | 242,111 |
| Inflow | | 241,667 | 241,667 | 241,667 | 241,667 | 241,667 | 241,667 | 241,667 | 259,631 | 262,175 | 262,175 | 262,175 | 262,175 |
| | Total Inflow | 241,667 | 241,667 | 241,667 | 241,667 | 241,667 | 241,667 | 241,667 | 259,631 | 262,175 | 262,175 | 262,175 | 262,175 |
| OutFlow | | | | | | | | | | | | | |
| COGS | | (85,167) | (85,167) | (85,167) | (85,167) | (85,167) | (85,167) | (83,667) | (89,775) | (90,640) | (90,640) | (90,640) | (90,640) |
| Overhead | | (137,843) | (137,843) | (137,843) | (137,843) | (137,843) | (137,843) | (138,343) | (193,968) | (138,842) | (138,842) | (138,842) | (138,842) |
| | Total outflow | (223,009) | (223,009) | (223,009) | (223,009) | (223,009) | (223,009) | (222,009) | (283,742) | (229,481) | (229,481) | (229,481) | (229,481) |
| Net cash from operations | | 18,658 | 18,658 | 18,658 | 18,658 | 18,658 | 18,658 | 19,658 | (24,111) | 32,694 | 32,694 | 32,694 | 32,694 |
| Other items affecting cash flow: | | | | | | | | | | | | | |
| Collections on Pre-filing AR | | - | - | - | - | - | - | - | - | - | - | - | - |
| Pymts of pre-confirmation Professional fees | | - | - | - | - | - | (62,420) | | | | | (54,097) | |
| Pymts of disposable income | | (36,747) | - | - | - | - | - | - | - | - | (30,000) | - | (49,095) |
| | | (36,747) | - | - | - | - | (62,420) | - | - | - | (30,000) | (54,097) | (49,095) |
| Ending cash balances | | 201,713 | 220,370 | 239,028 | 257,685 | 276,343 | 232,581 | 252,238 | 228,127 | 260,821 | 263,515 | 242,111 | 225,710 |
| Operating reserves: | | | | | | | | | | | | | |
| Payroll | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | (75,000) |
| Overhead | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | (150,710) |
| | | - | - | - | - | - | - | - | - | - | - | - | (225,710) |
| Disposable Income | | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 0 |

No assurance is provided on these financial reports.

**Magnacoustics Inc.**
**Proforma - Cash Flow - Cash Basis**
**For the Year Ended March 31, 2025**

| | Apr-24 | May-24 | Jun-24 | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 | Jan-25 | Feb-25 | Mar-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance - 3/31/24 | 225,710 | 235,771 | 245,331 | 264,691 | 284,051 | 246,411 | 265,771 | 288,430 | 251,090 | 273,751 | 296,412 | 319,073 |
| Inflow | 262,175 | 262,175 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 |
| Total Inflow | 262,175 | 262,175 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 |
| OutFlow | | | | | | | | | | | | |
| COGS | (94,197) | (94,198) | (94,200) | (94,200) | (94,200) | (94,200) | (90,900) | (90,900) | (90,900) | (90,900) | (90,900) | (90,900) |
| Overhead | (157,917) | (158,417) | (158,617) | (158,617) | (158,617) | (158,617) | (158,617) | (218,617) | (158,616) | (158,616) | (158,616) | (158,617) |
| Total outflow | (252,114) | (252,615) | (252,817) | (252,817) | (252,817) | (252,817) | (249,517) | (309,517) | (249,516) | (249,516) | (249,516) | (249,517) |
| Net cash from operations | 10,061 | 9,560 | 19,360 | 19,360 | 19,360 | 19,360 | 22,660 | (37,340) | 22,661 | 22,661 | 22,661 | 22,660 |
| Other items affecting cash flow: | | | | | | | | | | | | |
| Collections on Pre-filing AR | - | - | - | - | - | - | - | - | - | - | - | - |
| Pymts of pre-confirmation Professional fees | | | | | | | | | | | | |
| Pymts of disposable income | - | - | - | - | (57,000) | - | - | - | - | - | - | (51,522) |
| | - | - | - | - | (57,000) | - | - | - | - | - | - | (51,522) |
| Ending cash balances | 235,771 | 245,331 | 264,691 | 284,051 | 246,411 | 265,771 | 288,430 | 251,090 | 273,751 | 296,412 | 319,073 | 290,211 |
| Operating reserves: | | | | | | | | | | | | |
| Payroll | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | (90,000) |
| Overhead | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | (200,210) |
| | - | - | - | - | - | - | - | - | - | - | - | (290,210) |
| Disposable Income | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | (0) |

No assurance is provided on these financial reports.

**Magnacoustics Inc.**
**Proforma - Cash Flow - Cash Basis**
**For the Period Ended September 30, 2025**

| | | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 |
|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance - 3/31/25** | | **290,211** | **309,601** | **330,265** | **325,929** | **346,093** | **366,157** |
| Inflow | | 280,000 | 280,000 | 280,000 | 280,000 | 280,000 | 280,000 |
| | Total Inflow | 280,000 | 280,000 | 280,000 | 280,000 | 280,000 | 280,000 |
| OutFlow | | | | | | | |
| | COGS | (96,474) | (95,200) | (95,200) | (95,200) | (95,200) | (95,200) |
| | Overhead | (164,136) | (164,136) | (164,136) | (164,636) | (164,736) | (164,736) |
| | Total outflow | (260,610) | (259,336) | (259,336) | (259,836) | (259,936) | (259,936) |
| Net cash from operations | | 19,390 | 20,664 | 20,664 | 20,164 | 20,064 | 20,064 |
| Other items affecting cash flow: | | | | | | | |
| | Collections on Pre-filing AR | - | - | - | - | - | - |
| | Pymts of pre-confirmation Professional fees | - | - | - | - | - | - |
| | Pymts of disposable income | - | - | (25,000) | - | - | - |
| | | - | - | (25,000) | - | - | - |
| **Ending cash balances** | | **309,601** | **330,265** | **325,929** | **346,093** | **366,157** | **386,221** |
| Operating reserves: | | | | | | | |
| | Payroll | n/a | n/a | n/a | n/a | n/a | (95,000) |
| | Overhead | n/a | n/a | n/a | n/a | n/a | (291,221) |
| | | - | - | - | - | - | (386,221) |
| **Disposable Income** | | **n/a** | **n/a** | **n/a** | **n/a** | **n/a** | **n/a** |

No assurance is provided on these financial reports.

# Exhibit 3

**Magnacoustics Inc. - Debtor-in-Possession**
**Proforma - Profit and Loss - Cash Basis**
**For the Year Ended March 31, 2023**

| | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | For the year ended 3.31.23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | |
| 4000 · Gross Sales | 191,450 | 205,500 | 225,430 | 225,430 | 225,430 | 225,430 | 225,430 | 226,080 | 226,080 | 226,080 | 226,080 | 226,080 | 2,654,500 |
| 4820 · Royalty Payment income | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Income | 191,450 | 205,500 | 225,430 | 225,430 | 225,430 | 225,430 | 225,430 | 226,080 | 226,080 | 226,080 | 226,080 | 226,080 | 2,654,500 |
| Cost of Goods Sold | 65,093 | 69,870 | 76,646 | 76,646 | 76,646 | 76,646 | 76,646 | 76,207 | 76,867 | 76,867 | 76,867 | 76,867 | 901,870 |
| Gross Profit | 126,357 | 135,630 | 148,784 | 148,784 | 148,784 | 148,784 | 148,784 | 149,873 | 149,213 | 149,213 | 149,213 | 149,213 | 1,752,630 |
| **Expense** | | | | | | | | | | | | | |
| **6000 · Payroll expenses** | | | | | | | | | | | | | |
| 6009 · Payroll - Officer | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 | 175,000 |
| 6010 · Payroll - others | 34,542 | 34,542 | 34,542 | 34,542 | 34,542 | 34,542 | 34,542 | 34,542 | 34,542 | 34,542 | 34,542 | 34,542 | 414,500 |
| 6100 · Payroll Taxes | 3,930 | 3,930 | 3,930 | 3,930 | 3,930 | 3,930 | 3,930 | 3,930 | 3,930 | 3,930 | 3,930 | 3,930 | 47,160 |
| Total 6000 · Payroll expenses | 53,055 | 53,055 | 53,055 | 53,055 | 53,055 | 53,055 | 53,055 | 53,055 | 53,055 | 53,055 | 53,055 | 53,055 | 636,660 |
| 6200 · Rent Expense | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 62,280 |
| 6210 · Office Rent (Storage) | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 4,632 |
| 6300 · Telephone | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 9,600 |
| 6400 · Utilities | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 9,600 |
| 6500 · Office expenses & supplies | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,666 | 1,666 | 1,666 | 1,666 | 20,000 |
| 6510 · Postage | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 2,500 |
| 6520 · Computer and IT | 3,833 | 3,833 | 3,833 | 3,833 | 3,833 | 3,833 | 3,833 | 3,833 | 3,833 | 3,833 | 3,833 | 3,833 | 46,000 |
| 6530 · Copier | 458 | 458 | 458 | 458 | 458 | 458 | 458 | 458 | 458 | 458 | 458 | 458 | 5,500 |
| 6600 · Professional fees - current | 19,250 | 19,250 | 19,250 | 19,250 | 19,250 | 19,250 | 19,250 | 19,250 | 19,250 | 19,250 | 19,250 | 19,250 | 231,000 |
| 6605 · Trustee fees - monitoring | - | - | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 7,500 |
| 6650 · Payroll service charges | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| 6660 · Consultant | 6,104 | 6,104 | 6,104 | 6,104 | 6,104 | 6,104 | 6,104 | 6,104 | 6,104 | 6,104 | 6,104 | 6,104 | 73,250 |
| 6690 · Research & Development | 6,250 | 6,250 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 67,500 |
| 6715 · Insurance - health | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 9,800 | 117,600 |
| 6720 · Insurance - commercial | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 25,000 |
| Insurance - executive | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 2,200 |
| 6790 · Employee allowances | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 1,083 | 13,000 |
| 6800 · Advertising | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 20,000 |
| 6810 · Trade Show Exp. | - | - | - | - | - | - | - | 52,500 | - | - | - | - | 52,500 |
| 6850 · Repairs and maintenance | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 5,000 |
| 6855 · Security System | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 1,000 |
| 6860 · Grounds Maintenance | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| 6890 · Business Gifts | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 1,500 |
| 6895 · Calibration Exp. | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 1,500 |
| 6900 · Automobile Expense | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 2,500 |
| 7220 · Patent | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 10,000 |
| 7310 · Dues and Subscriptions | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 2,000 |
| 7800 · Travel Expenses | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 2,000 |
| 7810 · Meals | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 2,000 |
| 7950 · Bank Service Charges | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| 7960 · Credit Card Fees | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 37,500 |
| Total Expense | 119,436 | 119,436 | 119,436 | 119,436 | 119,436 | 119,436 | 119,436 | 171,936 | 119,435 | 119,435 | 119,435 | 119,435 | 1,485,722 |
| Net Ordinary Income | 6,922 | 16,195 | 29,348 | 29,348 | 29,348 | 29,348 | 29,348 | (22,063) | 29,778 | 29,778 | 29,778 | 29,778 | 266,908 |

No assurance is provided on these financial reports.

**Magnacoustics Inc. - Debtor-in-Possession**
Proforma - Profit and Loss - Cash Basis
For the Year Ended March 31, 2024

| | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 | Jan-24 | Feb-24 | Mar-24 | For the year ended 3.31.24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | |
| 4000 · Gross Sales | 241,667 | 241,667 | 241,667 | 241,667 | 241,667 | 241,667 | 241,667 | 259,631 | 262,175 | 262,175 | 262,175 | 262,175 | 3,000,000 |
| 4820 · Royalty Payment income | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Income** | 241,667 | 241,667 | 241,667 | 241,667 | 241,667 | 241,667 | 241,667 | 259,631 | 262,175 | 262,175 | 262,175 | 262,175 | 3,000,000 |
| **Cost of Goods Sold** | 85,167 | 85,167 | 85,167 | 85,167 | 85,167 | 85,167 | 83,667 | 89,775 | 90,640 | 90,640 | 90,640 | 90,640 | 1,047,000 |
| **Gross Profit** | 156,500 | 156,500 | 156,500 | 156,500 | 156,500 | 156,500 | 158,000 | 169,856 | 171,536 | 171,536 | 171,536 | 171,536 | 1,953,000 |
| **Expense** | | | | | | | | | | | | | |
| **6000 · Payroll expenses** | | | | | | | | | | | | | |
| 6009 · Payroll - Officer | 29,167 | 29,167 | 29,167 | 29,167 | 29,167 | 29,167 | 29,167 | 29,167 | 29,167 | 29,167 | 29,167 | 29,167 | 350,000 |
| 6010 · Payroll - others | 36,269 | 36,269 | 36,269 | 36,269 | 36,269 | 36,269 | 36,269 | 36,269 | 36,269 | 36,269 | 36,269 | 36,269 | 435,227 |
| 6100 · Payroll Taxes | 5,235 | 5,235 | 5,235 | 5,235 | 5,235 | 5,235 | 5,235 | 5,235 | 5,235 | 5,235 | 5,235 | 5,235 | 62,818 |
| **Total 6000 · Payroll expenses** | 70,670 | 70,670 | 70,670 | 70,670 | 70,670 | 70,670 | 70,670 | 70,670 | 70,670 | 70,670 | 70,670 | 70,670 | 848,045 |
| 6200 · Rent Expense | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 62,280 |
| 6210 · Office Rent (Storage) | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 4,632 |
| 6300 · Telephone | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 9,600 |
| 6400 · Utilities | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 10,800 |
| 6500 · Office expenses & supplies | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 27,000 |
| 6510 · Postage | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 2,500 |
| 6520 · Computer and IT | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,166 | 4,166 | 4,166 | 4,166 | 50,000 |
| 6530 · Copier | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| 6600 · Professional Fees - current | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 189,000 |
| 6650 · Payroll service charges | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| 6660 · Consultant | 4,708 | 4,708 | 4,708 | 4,708 | 4,708 | 4,708 | 4,708 | 4,708 | 4,708 | 4,708 | 4,708 | 4,708 | 56,500 |
| 6690 · Research & Development | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 75,000 |
| 6715 · Insurance - health | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,500 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 161,500 |
| 6720 · Insurance - commercial | 2,333 | 2,333 | 2,333 | 2,333 | 2,333 | 2,333 | 2,333 | 2,333 | 2,333 | 2,333 | 2,333 | 2,333 | 28,000 |
| Insurance - executive | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 2,500 |
| 6790 · Employee allowances | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 15,000 |
| 6800 · Advertising | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 25,000 |
| 6810 · Trade Show Exp. | - | - | - | - | - | - | - | 55,125 | - | - | - | - | 55,125 |
| 6850 · Repairs and maintenance | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 417 | 416 | 416 | 416 | 416 | 5,000 |
| 6855 · Security System | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 1,000 |
| 6860 · Grounds Maintenance | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| 6890 · Business Gifts | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 2,500 |
| 6895 · Calibration Exp. | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 209 | 209 | 209 | 209 | 2,500 |
| 6900 · Automobile Expense | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 292 | 3,500 |
| 7220 · Patent | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 10,000 |
| 7310 · Dues and Subscriptions | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 2,000 |
| 7800 · Travel Expenses | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 2,000 |
| 7810 · Meals | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 2,000 |
| 7950 · Bank Service Charges | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 2,500 |
| 7960 · Credit Card Fees | 3,438 | 3,438 | 3,438 | 3,438 | 3,438 | 3,438 | 3,438 | 3,438 | 3,438 | 3,438 | 3,438 | 3,438 | 41,250 |
| **Total Expense** | 137,843 | 137,843 | 137,843 | 137,843 | 137,843 | 137,843 | 138,343 | 193,968 | 138,842 | 138,842 | 138,842 | 138,842 | 1,714,732 |
| **Net Ordinary Income** | 18,658 | 18,658 | 18,658 | 18,658 | 18,658 | 18,658 | 19,658 | (24,111) | 32,694 | 32,694 | 32,694 | 32,694 | 238,268 |

No assurance is provided on these financial reports.

**Magnacoustics Inc. - Debtor-in-Possession**
**Proforma - Profit and Loss - Cash Basis**
**For the Year Ended March 31, 2025**

| | Apr-24 | May-24 | Jun-24 | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 | Jan-25 | Feb-25 | Mar-25 | For the year ended 3.31.25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | |
| 4000 · Gross Sales | 262,175 | 262,175 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 3,246,120 |
| 4820 · Royalty Payment income | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Income** | 262,175 | 262,175 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 272,177 | 3,246,120 |
| **Cost of Goods Sold** | 94,197 | 94,198 | 94,200 | 94,200 | 94,200 | 94,200 | 90,900 | 90,900 | 90,900 | 90,900 | 90,900 | 90,900 | 1,110,595 |
| **Gross Profit** | 167,978 | 167,977 | 177,977 | 177,977 | 177,977 | 177,977 | 181,277 | 181,277 | 181,277 | 181,277 | 181,277 | 181,277 | 2,135,525 |
| **Expense** | | | | | | | | | | | | | |
| 6000 · Payroll expenses | | | | | | | | | | | | | |
| 6009 · Payroll - Officer | 33,333 | 33,333 | 33,333 | 33,333 | 33,333 | 33,333 | 33,333 | 33,333 | 33,333 | 33,333 | 33,333 | 33,333 | 400,000 |
| 6010 · Payroll - others | 47,458 | 47,458 | 47,458 | 47,458 | 47,458 | 47,458 | 47,458 | 47,458 | 47,458 | 47,458 | 47,458 | 47,458 | 569,495 |
| 6100 · Payroll Taxes | 6,463 | 6,463 | 6,463 | 6,463 | 6,463 | 6,463 | 6,463 | 6,463 | 6,463 | 6,463 | 6,463 | 6,463 | 77,560 |
| **Total 6000 · Payroll expenses** | 87,255 | 87,255 | 87,255 | 87,255 | 87,255 | 87,255 | 87,255 | 87,255 | 87,255 | 87,255 | 87,255 | 87,255 | 1,047,055 |
| 6200 · Rent Expense | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 62,280 |
| 6210 · Office Rent (Storage) | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 386 | 4,632 |
| 6300 · Telephone | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 9,600 |
| 6400 · Utilities | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 10,800 |
| 6500 · Office expenses & supplies | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 27,000 |
| 6510 · Postage | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 2,500 |
| 6520 · Computer and IT | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,166 | 4,166 | 4,166 | 4,166 | 50,000 |
| 6530 · Copier | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| 6600 · Professional Fees - current | 17,917 | 17,917 | 17,917 | 17,917 | 17,917 | 17,917 | 17,917 | 17,917 | 17,917 | 17,917 | 17,917 | 17,917 | 215,000 |
| 6650 · Payroll service charges | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| 6660 · Consultant | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 25,000 |
| 6690 · Research & Development | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 75,000 |
| 6715 · Insurance - health | 14,500 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 179,500 |
| 6720 · Insurance - commercial | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Insurance - executive | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| 6790 · Employee allowances | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 15,000 |
| 6800 · Advertising | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 25,000 |
| 6810 · Trade Show Exp. | - | - | - | - | - | - | - | 60,000 | - | - | - | - | 60,000 |
| 6850 · Repairs and maintenance | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| 6855 · Security System | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| 6860 · Grounds Maintenance | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 7,200 |
| 6890 · Business Gifts | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| 6895 · Calibration Exp. | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| 6900 · Automobile Expense | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| 7220 · Patent | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 10,000 |
| 7310 · Dues and Subscriptions | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| 7800 · Travel Expenses | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| 7810 · Meals | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| 7950 · Bank Service Charges | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| 7960 · Credit Card Fees | 5,245 | 5,245 | 5,445 | 5,445 | 5,445 | 5,445 | 5,445 | 5,445 | 5,445 | 5,445 | 5,445 | 5,446 | 64,935 |
| **Total Expense** | 157,917 | 158,417 | 158,617 | 158,617 | 158,617 | 158,617 | 158,617 | 218,617 | 158,616 | 158,616 | 158,616 | 158,617 | 1,962,502 |
| **Net Ordinary Income** | 10,061 | 9,560 | 19,360 | 19,360 | 19,360 | 19,360 | 22,660 | (37,340) | 22,661 | 22,661 | 22,661 | 22,660 | 173,023 |

No assurance is provided on these financial reports.

**Magnacoustics Inc. - Debtor-in-Possession**
**Proforma - Profit and Loss - Cash Basis**
**For the Period Ended September 2025**

| | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | For the period ended 9.30.25 |
|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | |
| **Income** | | | | | | | |
| 4000 · Gross Sales | 280,000 | 280,000 | 280,000 | 280,000 | 280,000 | 280,000 | 1,680,000 |
| 4820 · Royalty Payment income | - | - | - | - | - | - | - |
| **Total Income** | 280,000 | 280,000 | 280,000 | 280,000 | 280,000 | 280,000 | 1,680,000 |
| **Cost of Goods Sold** | 96,474 | 95,200 | 95,200 | 95,200 | 95,200 | 95,200 | 571,200 |
| **Gross Profit** | 183,526 | 184,800 | 184,800 | 184,800 | 184,800 | 184,800 | 1,108,800 |
| **Expense** | | | | | | | |
| 6000 · Payroll expenses | | | | | | | |
| 6009 · Payroll - Officer | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 210,000 |
| 6010 · Payroll - others | 49,831 | 49,831 | 49,831 | 49,831 | 49,831 | 49,831 | 298,985 |
| 6100 · Payroll Taxes | 6,786 | 6,786 | 6,786 | 6,786 | 6,786 | 6,786 | 40,719 |
| Total 6000 · Payroll expenses | 91,617 | 91,617 | 91,617 | 91,617 | 91,617 | 91,617 | 549,704 |
| 6200 · Rent Expense | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 5,190 | 31,140 |
| 6210 · Office Rent (Storage) | 386 | 386 | 386 | 386 | 386 | 386 | 2,316 |
| 6300 · Telephone | 900 | 900 | 900 | 900 | 900 | 900 | 5,400 |
| 6400 · Utilities | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 6,000 |
| 6500 · Office expenses & supplies | 2,500 | 2,500 | 2,500 | 3,000 | 3,000 | 3,000 | 16,500 |
| 6510 · Postage | 250 | 250 | 250 | 250 | 250 | 250 | 1,500 |
| 6520 · Computer and IT | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 24,000 |
| 6530 · Copier | 500 | 500 | 500 | 500 | 500 | 500 | 3,000 |
| 6600 · Professional Fees - current | 18,833 | 18,833 | 18,833 | 18,833 | 18,833 | 18,833 | 113,000 |
| 6650 · Payroll service charges | 600 | 600 | 600 | 600 | 600 | 600 | 3,600 |
| 6660 · Consultant | 600 | 600 | 600 | 600 | 600 | 600 | 3,600 |
| 6690 · Research & Development | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 21,000 |
| 6715 · Insurance - health | 16,500 | 16,500 | 16,500 | 16,500 | 16,500 | 16,500 | 99,000 |
| 6720 · Insurance - commercial | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 18,000 |
| Insurance - executive | 500 | 500 | 500 | 500 | 500 | 500 | 3,000 |
| 6790 · Employee allowances | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 7,500 |
| 6800 · Advertising | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 15,000 |
| 6810 · Trade Show Exp. | - | - | - | - | - | - | - |
| 6850 · Repairs and maintenance | 700 | 700 | 700 | 700 | 700 | 700 | 4,200 |
| 6855 · Security System | 125 | 125 | 125 | 125 | 125 | 125 | 750 |
| 6860 · Grounds Maintenance | 700 | 700 | 700 | 700 | 800 | 800 | 4,400 |
| 6890 · Business Gifts | 500 | 500 | 500 | 500 | 500 | 500 | 3,000 |
| 6895 · Calibration Exp. | 500 | 500 | 500 | 500 | 500 | 500 | 3,000 |
| 6900 · Automobile Expense | 350 | 350 | 350 | 350 | 350 | 350 | 2,100 |
| 7220 · Patent | 833 | 833 | 833 | 833 | 833 | 833 | 5,000 |
| 7310 · Dues and Subscriptions | 200 | 200 | 200 | 200 | 200 | 200 | 1,200 |
| 7800 · Travel Expenses | 300 | 300 | 300 | 300 | 300 | 300 | 1,800 |
| 7810 · Meals | 400 | 400 | 400 | 400 | 400 | 400 | 2,400 |
| 7950 · Bank Service Charges | 300 | 300 | 300 | 300 | 300 | 300 | 1,800 |
| 7960 · Credit Card Fees | 5,601 | 5,601 | 5,601 | 5,601 | 5,601 | 5,601 | 33,606 |
| **Total Expense** | 164,136 | 164,136 | 164,136 | 164,636 | 164,736 | 164,736 | 986,516 |
| **Net Ordinary Income** | 19,390 | 20,664 | 20,664 | 20,164 | 20,064 | 20,064 | 121,010 |

No assurance is provided on these financial reports.

**EXHIBIT 4**

RESTATEMENT OF THE APRIL 30, 2021
INTELLECTUAL PROPERTY LICENSE AGREEMENT

THIS INTELLECTUAL PROPERTY LICENSE AGREEMENT (this "Agreement") is made as of April 30th, 2021 (the "Effective Date") by and between:

> LISA CAROLYN LEDERER, an individual resident of New York, having a business address of 200 Granada St., Atlantic Beach, NY 11509 ("Lederer" or 'Licensor'); and

> MAGNACOUSTICS, INC., a New York corporation, having a business address of 1995 Park Street, Atlantic Beach, New York 11509 ("Magnacoustics" or Licensee").

Each of Lederer/Licensor and Magnacoustics/Licensee may be referred to herein as a "Party", and, collectively, as the "Parties".

RECITALS

WHEREAS, Lederer owns and has the rights to license the Licensed Patent Rights and the Licensed Know-How (all defined below); and

WHEREAS, Lederer desires to license to Magnacoustics, and Magnacoustics desires to obtain a license from Lederer to, the Licensed Patent Rights and the Licensed Know-How, on the terms and conditions and as more fully outlined herein.

NOW THEREFORE, in consideration of the premises and the mutual covenants contained herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## 1. DEFINITIONS

The following terms, as defined herein, shall have the same meanings in both their singular and plural forms:

1.1     **"Change of Control"** means any transaction, or series of transactions or any other change in the current (as of the Effective Date) ownership or control of Licensee, that results in Licensor owning or controlling less than fifty-one percent (51 %) of Licensee, or a sale of all or substantially all of the assets of Licensee.

1.2     **"Improvement"** means any additional feature or function, or any enhancement of a feature or function, of the Licensed Rights and/or Licensed Products which Licensee discovers or develops during the Term.

1.3     "**Licensed Know-How**" means the expertise related to the Licensed Patent Rights owned or controlled by Licensor.

1.4     "**Licensed Products**" means any products, devices or methods that are covered by one or more Valid Claims of the Licensed Patent Rights and/or that utilize any Licensed Know-How.

1.5     "**Licensed Patent Rights**" means any and all domestic and foreign patents and patent applications (including inventor's certificates and utility models) listed on attached Exhibit A, including any substitutions, extensions, reissues, reexaminations, renewals, divisionals, continuations, continuations-in-part and foreign counterparts of any of the foregoing.

1.6     "**Territory**" means the world.

1.7     (Omitted)

1.8     "**Valid Claim**" means any issued patent claim within the Licensed Patent Rights that has not expired or been finally held invalid by a patent office or by a court of competent jurisdiction or any claim pending within the Licensed Patent Rights.

## ARTICLE 2. LICENSES; RESTRICTIONS; NO OTHER RIGHTS

**2.1 Licensed Patent Rights and Licensed Know-How**:

    (a) <u>License Grant</u>. Licensor hereby grant to Licensee, and Licensee hereby accepts, subject to the terms and conditions of this Agreement, a nonexclusive, perpetual, royalty-free, fully paid-up, license, without rights of sublicense, and with limited right of transfer (solely as permitted in Section 10.2 below) under the Licensed Patent Rights and the Licensed Know-How, to make, have made, use, sell, offer for sale, import, market and otherwise utilize and commercialize Licensed Products and any Improvements, and practice any method covered in whole or in part by the Licensed Patent Rights, throughout the Territory (the "Patent and Know-How License").

    (b) <u>No Sublicenses</u>. The Patent and Know-How License granted to Licensee in Section 2.1(a) above does not include any rights of sublicense. As such, Licensee agrees not to grant any right under the Patent and Know-How License to any third party without the prior express written consent of Licensor (such consent to be in Licensor's sole discretion).

2.2     (Omitted)

2.3     **No Other Rights**. Licensor hereby reserves all rights not expressly granted to Licensee in the Patent and Know-How License.

## ARTICLE 3. PERFORMANCE OBLIGATIONS

3.1     **Delivery**. Licensor agrees to deliver to Licensee information in her possession sufficient to practice the Patent and Know-How License.

## ARTICLE 4 - UPFRONT ECONOMICS

4.1     **No Upfront Economics**. Subject at all times to Article 9 (Change of Control), Licensee shall not be obligated to pay any upfront economics to Licensor for the Patent and Know-How License.

## ARTICLE 5 - AUDIT RIGHTS

5.1     **Records**. Licensee shall use commercially reasonable efforts to keep accurate and correct records of all Licensed Products sold by Licensee pursuant to this Agreement ("Licensed Product Records").

5.2     **Audits**. All Licensed Product Records of Licensee shall be available upon prior written reasonable request for inspection by Licensor or its designee at the expense of Licensor for the purpose of verifying reports under this Agreement.

## ARTICLE 6 - PATENT MATTERS

6.1     **Patent Prosecution and Maintenance**.  Licensor and Licensee shall confer with each other and cooperate in good faith to determine the roles of Licensor and/or Licensee in the prosecution and maintenance of the Licensed Patent Rights.

6.2     **Infringement**.

(a)     Each Party shall notify the other Party in writing of any suspected infringement of the Licensed Patent Rights or misappropriation of Licensed Know-How.

(b)     In the event of any infringement of the Licensed Patents or misappropriation of the Licensed Know-How, the Parties will confer together to determine if they want to pursue legal action against such infringer or misappropriator in cooperation with each other, and if so the roles of each, including how the Parties will bear the expenses of such legal action, provided that Licensor shall have the final decision authority on such activities. Licensor and Licensee each agree to cooperate with the other in all respects associated with any legal action taken under this Section 6.2(b), including, without limitation to make directors, officers, employees and agents of the Parties available to testify, and to join in any such suit as a voluntary plaintiff, if needed.

6.3 **Improvements; Assignment; and Further Assurances**. As between the Parties, Licensor shall exclusively own all Improvements, and Licensee agrees to, and does hereby, assign to Licensor, and Licensor hereby accepts, any and all rights Licensee has or may have in and to such Improvements. Licensee hereby acknowledges and agrees that such assignments may include rights and inventions not yet in existence, and agrees to take further actions, including executing additional documents, at Licensor's request and reasonable expense, to further evidence or record such assignment.

6.4 **License to Improvements**. All Improvements shall automatically become subject to the Patent and Know-How License granted to Licensee without either Party having to act further. The Parties shall work in good faith to determine what, if any, efforts should be undertaken to formally protect any such Improvements.

6.5 **Markings**. Licensee agrees to mark Licensed Products covered by issued patents within the Licensed Patent Rights as provided by 35 U.S.C. 287(a) and any foreign patent marking requirements. Upon expiration of any listed patent, Licensee agrees to stop marking Licensed Products with such expired patent number.

## ARTICLE 7 - TERMINATION OF THIS AGREEMENT

7.1 **Term**. This Agreement shall be as of the Effective Date and shall continue until the Agreement is terminated in accordance with this Article 7 (the "Term").

7.2 **Termination**.

(a) <u>For Cause</u>. Either Party may terminate this Agreement for cause: (i) upon thirty (30) days' written notice in the event of a material breach of this Agreement by the other Party, and the failure to cure such breach to the terminating Party's reasonable satisfaction within that thirty-day period; or (ii) immediately, upon the insolvency, bankruptcy, receivership, dissolution, or assignment for the benefit of creditor by the other Party.

(b) <u>Change of Control</u>. Licensor may also terminate this Agreement immediately upon written notice to Licensee in the event Licensee experiences a Change of Control.

(c) <u>Without Cause</u>. Either Party may also terminate this Agreement without cause (including for its convenience) upon ninety days' written notice to other Party.

7.3 **Effect of Termination**. On termination of this Agreement for any reason, the Patent and Know-How License shall automatically terminate without either Party having to act further, subject only to Section 7.4 below for the disposition of Licensed Products by Licensee.

**7.4    Disposition of Licensed Products.** Upon termination of this Agreement as permitted in this Article 7 (except by Licensor pursuant to Section 7.2(a) above (for Licensee's uncured material breach)), for a period of one hundred and eighty (180) days after the date of such termination Licensee may complete and sell or otherwise dispose of for consideration any partially made or existing Licensed Product.

**7.5    Survival on Termination.** Any remedies for breach, and Article l (Definitions), Article 5 (Audit Rights), Article 10 (Miscellaneous), Sections 6.3, 8.2, 8.3, 9.2 and this Section 7.5 (Survival on Termination), shall survive the termination of this Agreement.

## ARTICLE 8 - REPRESENTATIONS AND WARRANTIES; DISCLAIMER; LIMITATION OF LIABILITIES

8.1 **Representations and Warranties**.

(a) <u>By Licensor</u>. Licensor hereby represents and warrants to Licensee that:

(i) Licensor is the sole owner of the Licensed Patent Rights and the Licensed Know-How, and has the lawful right to grant the Patent and Know-How License set forth herein;

(ii) to Licensor 's knowledge, none of the Licensed Patent Rights are the subject of any pending interference, opposition, cancellation, or other challenge or adversarial proceeding;

(iii) Licensor has neither assigned nor granted any license or other rights to the Licensed Patent Rights or the Licensed Products that would interfere with the rights granted to Licensee herein and Licensor is under no obligation to grant any such license or rights to any entity or person; and

(iv) the execution and delivery of this Agreement, and the performance by Licensor of her obligations hereunder have been duly authorized by all necessary corporate or other action on the part of Licensor, and no consents, waivers, or permissions that have not already been granted are required for such actions.

(b) <u>By Licensee</u>. Licensee hereby represents and warrants to Licensor the execution and delivery of this Agreement, and the performance by Licensee of its obligations hereunder have been duly authorized by all necessary corporate or other action on the part of Licensee, and no consents, waivers, or permissions that have not already been granted are required for such actions.

8.2    **DISCLAIMER**. EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH ABOVE, EACH OF THE PARTIES HEREBY DISCLAIMS ALL OTHER WARRANTIES OF ANY KIND, EXPRESS, IMPLIED, STATUTORY, OR IN ANY COMMUNICATION BETWEEN THEM, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT, AND FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY OF THE LICENSED RIGHTS OR LICENSED PRODUCTS SUBJECT TO THIS AGREEMENT.

8.3    **LIMITATION OF LIABILITIES. NEITHER PARTY SHALL BE LIABLE FOR (A) ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL LOSS OR DAMAGES, OR (B) ANY DAMAGES RELATING TO A CLAIM MADE AGAINST THE OTHER PARTY BY A THIRD PARTY ARISING OUT OF OR RELATED TO THIS AGREEMENT**.

## ARTICLE 9 - CHANGE OF CONTROL

9.1    **Change of Control**. In the event that: (a) Licensee experiences a Change of Control at any time during the Term; and (b) Licensor does not provide written consent to such Change of Control (an "Unapproved Change of Control"), then each of the Parties acknowledges and agrees that this Agreement, including the Patent and Know-How License granted to Licensee hereunder, shall automatically be terminated without either Party having to act further.

9.2    **Extension of Licenses**. Licensor agrees to offer a license to the Licensed Know-How and to the Licensed Patent Rights to a third party involved with an Unapproved Change of Control under commercially reasonable terms and conditions to be set forth in a separate written agreement, such terms and conditions to include at least the following customary terms of an IP license agreement: (a) the license shall be royalty-bearing, including a royalty rate on Licensed Products of at least five percent (5%) of net sales; (b) expense sharing for prosecution and maintenance associated with the Licensed Patent Rights; and (c) other standard and customary terms and conditions appropriate for the context of the Parties' relationship, including, without limitation: Confidentiality; Infringement; Representations and Warranties; Indemnification; Limitation of Liability; Assignment; Publicity; Waivers; and Governing Law and Venue, unless otherwise agreed to by the Licensor.

## ARTICLE 10 - MISCELLANEOUS PROVISIONS

10.1    **Notice**. Any notice required to be given to either Party under this Agreement shall be deemed to have been properly given and effective: on the date of delivery if delivered in person, or five (5) days after mailing if mailed by first-class or certified mail, postage paid, to the respective addresses given below, or to such other address as is designated by written notice given to the other Party.

> *If sent to Lederer:*
> LISA CAROLYN LEDERER
> 200 Granada St.
> Atlantic Beach, NY 11509

*If sent to Magnacoustics*:
MAGNACOUSTICS, INC.,
1995 Park Street
Atlantic Beach , New York 11509
Attention: MARTIN LYDON

10.2   **Assignability**. Neither this Agreement nor any right or obligation hereunder may be assigned or otherwise transferred (whether voluntarily, by operation of law or otherwise, including via a Change of Control), in whole or in part, by Licensee without the prior express written consent of Licensor (such consent to be in Licensor 's sole discretion). Licensor may assign or otherwise transfer this Agreement and/or its rights and obligations hereunder in Licensor's sole discretion, provided that any such assignee or transferee shall agree to be bound by the terms and conditions of this Agreement. Any purported assignment of other transfer not expressly permitted in this Section 10.2 shall be null and void *ab initio*. This Agreement shall be binding upon and be to the benefit of the Parties hereto and their heirs, successors and permitted assignees.

10.3   **No Waiver**. No waiver by either Party of any breach or default of any covenant or agreement set forth in this Agreement shall be deemed a waiver as to any subsequent and/or similar breach or default.

10.4   **Governing Laws/ Venue**. This Agreement is governed by the laws of the United States and the state of New York without regard to the conflicts of laws principles thereof, but the scope and validity of any patent or patent application shall be governed by the applicable laws of the country of the patent or patent application. The exclusive jurisdiction and venue for actions related to the subject matter of this Agreement shall be the state and U.S. federal court having within their jurisdiction New York. Both Parties irrevocably consent to the exclusive jurisdiction of such courts and agree that process may be served in the manner provided herein for giving notice or otherwise as allowed by New York or U.S. federal law.

10.5   **Force Majeure**. A Party to this Agreement may be excused from any performance required herein if such performance is rendered impossible or unfeasible due to any catastrophe or other event beyond its reasonable control, including, without limitation, war, terrorism, riot, and insurrection; laws, proclamations, edicts, ordinances, or regulations; strikes, lockouts, or other serious labor disputes; floods, fires, explosions, pandemics (including the global COVID-19 pandemic); or other natural disasters. When such events have abated the non-performing Party's obligation herein shall automatically resume.

10.6   **Headings**. The headings of the several sections are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

10.7   **Entire Agreement**. This Agreement embodies the entire understanding of the Parties and supersedes all previous communications, representations or understandings, either oral or written, between the Parties relating to the subject matter hereof.

10.8    **Amendments**. No amendment or modification of this Agreement shall be valid or binding on the Parties unless made in writing and signed on behalf of each Party.

10.9    **Severability**. In the event that any of the provisions contained in this Agreement is held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if the invalid, illegal, or unenforceable provision had never been contained in it.

10.10   **Counterparts**. This Agreement may be executed simultaneously with any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, each of Lederer and Magnacoustics has executed this Agreement on the day and year written below.


**LISA CAROLYN LEDERER**

  *S/ Lisa Lederer*
(Signature)

Date: April 30, 2021


**MAGNACOUSTICS, INC.**

  *S/ Marty Lydon*

(Signature)
  Chief Operating Officer
(Title)

Date: April 30, 2021

**EXHIBIT A**
**List of Patents/Patent Applications**

| Country/Region | Appl. No. | Patent No. | Title |
| --- | --- | --- | --- |
| US | 10/723,774 | 7,292,704 | Noise Attenuating Headset |
| US | 11/851,860 | 7,609,844 | Noise Attenuating Headset |
| US | 13/037,108 | RE43,595 E | Noise Attenuating Headset |
| US | 11/850,976 | 8,064,980 | Initiating a Scan in a Medical Imaging System |
| US | 13/273,998 (Published as 2012/0035455) | -- | Initiating a Scan in a Medical Imaging System |
| US | 07/333,335 | 4,933,981 | Sound System |
| US | 07/591,789 | RE34,219 | Sound System |
| US | 90/011,003 | -- | Noise Attenuating Headset |
| US | 90/011,133 | -- | Noise Attenuating Headset |
| US | 13/273,998 | -- | Initiating a Scan in a Medical Imaging System |
| US | 90/013,807 | RE43,595C1 | Noise Attenuating Headset |
| PCT | PCT/US2004/035629 | -- | Noise Attenuating Headset |
| PCT | PCT/US2007/077778 | -- | Initiating a Scan in a Medical Imaging System |
| DE | 07841985.0 | 602007054088.7 | Initiating a Scan in a Medical Imaging System |
| EPO | 07841985.0 | 2063768 | Initiating a Scan in a Medical Imaging System |
| EPO | 18158569.6 | -- | Initiating a Scan in a Medical Imaging System |
| FR | 07841985.0 | 2063768 | Initiating a Scan in a Medical Imaging System |
| UK | 07841985.0 | 2063768 | Initiating a Scan in a Medical Imaging System |
| NL | 07841985.0 | 2063768 | Initiating a Scan in a Medical Imaging System |
| JP | 2009-527568 | 5,180,963 | Initiating a Scan in a Medical Imaging System |